479 So.2d 329 (1985)
LOUISIANA STATE BAR ASSOCIATION
v.
Larry Preston WILLIAMS.
Nos. 84-B-1403, 84-B-1458.
Supreme Court of Louisiana.
December 2, 1985.
On Rehearing March 20, 1986.
*330 Thomas O. Collins, Jr., Wood Brown, III, New Orleans, Robert J. Boudreau, Lake Charles, Sam J. D'Amico, Baton Rouge, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee, Metairie, Roland J. Achee, Shreveport, Gerald F. Thomas, Jr., Natchitoches, for applicant.
Dwight Doskey, Kern A. Reese, Larry Preston Williams, New Orleans, for respondent.
MARCUS, Justice.
The Louisiana State Bar Association, through its Committee on Professional Responsibility, instituted two proceedings against Larry Preston Williams, a member of said association. Prior to the commencement of each proceeding, the committee had conducted investigations of respondent's alleged misconduct in accordance with article 15, section 3 of the articles of incorporation of the association. Notice of the first proceeding, No. 84-B-1403, which involved fourteen specifications of misconduct, was sent to respondent by certified mail dated August 12, 1982. The committee notified respondent of the second proceeding, No. 84-B-1458, which contained nine specifications of misconduct, by certified mail dated September 2, 1983.
The committee held the formal investigative hearing on the fourteen specifications set forth in 84-B-1403 in the fall of 1982 as provided by article 15, section 3(b) of the articles of incorporation.[1] Respondent was present. He was represented by Thomas E. Papale and testified on his own behalf. Based upon the evidence adduced at this hearing, the committee, by a majority vote, was of the opinion that respondent had violated the laws of this state relating to the professional conduct of lawyers and to the practice of law of sufficient gravity as to evidence a lack of moral fitness for the practice of law. Specifically, the committee found that the evidence supported all but two of the specifications of misconduct.[2] On July 25, 1984, the committee instituted in this court a suit for disciplinary *331 action against respondent under the provisions of article 15, section 4(c) of the articles of incorporation. Respondent did not file an answer to the petition.
The committee conducted the formal investigative hearing on the nine specifications of misconduct set forth in 84-B-1458 on October 7 and November 9, 1983. After reviewing the evidence presented at this hearing, the committee decided, by a majority vote, that respondent was guilty of the misconduct described in specifications 1, 2, 3, 4, 5, 7 and 8.[3] In its opinion, the severity of respondent's violations of this state's laws governing the professional conduct of lawyers and the practice of law evidenced a lack of moral fitness for the practice of law. The committee filed a petition for disciplinary action with this court on July 31, 1984. Respondent did not answer this petition.
On November 9, 1984, in response to a motion by the committee, this court ordered the consolidation of 84-B-1403 and 84-B-1458 and appointed Ernest L. O'Bannon commissioner. As commissioner, he was required to take evidence and to file with this court a written report containing his findings of fact and conclusions of law. Louisiana State Bar Association Articles of Incorporation, article 15, section 6(b) and (d).
A hearing before the commissioner was held on December 20, 1984. Respondent did not appear. The committee introduced in evidence the entire record of the earlier investigative hearings. The commissioner noted that he could close the matter after the committee presented its case. Taking into account the seriousness of the charges, however, he decided to give respondent one more opportunity to present evidence or testimony. The continuation of the hearing was scheduled for January 17, 1985 and later reset for February 6, 1985. Again respondent failed to appear at the hearing. He was, however, represented by counsel. Respondent's counsel requested a continuance. The commissioner denied this request. The record was closed. The commissioner filed with this court his written report wherein he stated his findings of fact, conclusions of law and recommendation that respondent be suspended and submitted the matter for this court's determination. The committee concurred with some of the commissioner's findings but opposed others recommending that respondent be disbarred. Respondent filed an opposition to the commissioner's report. After oral argument before this court, the matter was submitted for our determination on the record before the commissioner.[4]
The bar association has the burden of establishing by clear and convincing evidence that respondent was guilty of the alleged specifications of misconduct. Louisiana State Bar Association v. Dowd, 445 So.2d 723 (La.1984).

Commingling, Converting, or Withholding Client's Funds

D.R. 1-102 and D.R. 9-102[5]
In five specifications of misconduct, arising out of three different factual situations, *332 the committee alleged that respondent had commingled, converted, or withheld funds belonging to his clients. These specifications were numbers 2, 3, 9 and 10 of 84-B-1403 and number 4 of 84-B-1458.
Specification 2 (84-B-1403) alleged that:
In February of 1981, you represented Mrs. Sandra Gorham, [sic] in a claim for personal injury. On February 5, 1981, you settled said claim and received the sum of $2500.00 from the insurance carrier involved. You then issued your check, in the sum of $1655.00, payable to your client. Said check was returned NSF and, despite repeated requests, you failed, refused and neglected to make said check good until March 4, 1981; all in violation of Disciplinary Rule 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 3 (84-B-1403) alleged that:
In connection with the previous Specification and as evidenced by the issuance of your NSF check, you did commingle and convert said funds, in the amount of $1655.00, to your own use; all in violation of Disciplinary Rule 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, Mrs. Gorum testified that she tried to cash respondent's $1655.00 check drawn on his trust account at Liberty Bank three days after he had issued it to her. The bank refused to accept the check because the trust account did not contain sufficient funds to cover it. Mrs. Gorum contacted respondent who told her to wait ten days and then to resubmit the check to the bank. Mrs. Gorum followed his instructions. Again, the bank rejected it as NSF. After this attempt, Mrs. Gorum sent a letter to the state bar association which it received on February 23, 1981. Respondent finally paid Mrs. Gorum the money he owed her on March 4, 1981.
In response to Mrs. Gorum's testimony, respondent explained why his check had not been honored. Paul Adams, respondent's associate, had handled Mrs. Gorum's claim. The $2500.00 check, in settlement of the claim, was made out to "Sandra Gorum, as natural tutrix of her minor son, Louis Brown, and their atty. Paul Adams." Respondent expected Adams to deposit the settlement check in the trust account. Adams, however, mistakenly deposited it in respondent's savings account. Because the $2500.00 had been placed in the savings account, the trust account did not contain sufficient funds to cover the $1655.00 check issued to Mrs. Gorum. When Mrs. Gorum informed respondent of the bank's refusal to cash the check, he reviewed his trust account balance. Noticing the deficiency, he concluded that the insurer's check must not have cleared. For this reason, he told her to wait ten days. At no time did the balance in respondent's savings account fall below $1655.00.
The commissioner found that specifications 2 and 3 had not been proved.[6] He reasoned that *333 [t]he evidence establishes that the Gorham [sic] settlement funds were received on or about February 5, 1981 and deposited by an associate of respondent to respondent's savings account in the Liberty Bank, not his client's trust account. There is no evidence that respondent instructed his associate to make the deposit in this account, and respondent's uncontradicted testimony is that the deposit was made to the savings account without his knowledge and in error.... Accordingly, the Commissioner finds that the bar association has failed to prove a violation of D.R. 1-102 and D.R. 9-102.
We concur in the commissioner's finding that specification 3 had not been proved; respondent did not convert or commingle Mrs. Gorum's funds. We believe, however, that he erred in finding that the committee had not proved specification 2. Mrs. Gorum told respondent that his check had been returned NSF in the second week of February, yet she did not receive her money until March 4, almost two weeks after she had complained to the bar association. This delay in delivering to Mrs. Gorum the funds to which she was entitled violated rules 1-102(A)(6) and 9-102(B)(4).
Specification 9 (84-B-1403) alleged:
That you did represent Mrs. Anita Lewis in certain personal injury litigation and settled her claim on November 10, 1981, for the full sum of $4702.89. You then issued your check to your client in the sum of $2821.73, for her share of the settlement. Said check was returned NSF on two occasions and you have failed, refused and neglected to make said check good; all in violation of Disciplinary Rule 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 10 (84-B-1403) alleged:
That as evidenced by the issuance of your NSF check, as set forth in Specification No. 9, you did commingle and convert monies in the sum of $2821.73, belonging to your client, Mrs. Anita Lewis, to your own use; all in violation of Disciplinary Rule 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, Mrs. Lewis testified that she had deposited respondent's check with her bank on November 30, 1981 and that it was returned to her NSF on December 5, 1981. Respondent told her to redeposit it; she did this on December 9, 1981, and again it was returned NSF. When Mrs. Lewis informed respondent that her second attempt to cash the check had failed, he speculated that there must have been some problem with the insurance company's check. After looking into the matter, he called Mrs. Lewis and told her that the insurance company's check would not clear for sixty days.[7] He promised to set up an appointment with her at which time he would take her to the bank and have his check certified. Mrs. Lewis did not hear from respondent after he made this promise. As of the commencement of the hearing, no restitution had been made. Finally, on October 7, 1982, three weeks after she had testified and almost eleven months after she had settled with the insurer, respondent paid Mrs. Lewis the money he owed her.
Respondent testified that the bank was to blame for Mrs. Lewis' problem. Prior to his settling Mrs. Lewis' claim, respondent had borrowed money from Liberty Bank for personal purposes. Under the terms of the loan agreement, he was obligated to repay the loan in monthly installments. At the time he deposited Mrs. Lewis' settlement check in his trust account, he had fallen behind on these loan payments. The bank recovered the overdue installments by debiting respondent's trust account on November 19, 1981, in the amounts of $234.40, $728.67 and $568.37. As a result of these debits, respondent's trust account did not contain sufficient funds to cover his check to Mrs. Lewis. He claimed that this was the first time the bank had used trust account funds to satisfy his personal obligations *334 and that he called the bank officer immediately to prevent the situation from recurring. Respondent added that the delay in making restitution was due to a misunderstanding; when Mrs. Lewis did not contact him again, he assumed that his check to her had cleared.
The commissioner found that the committee had not proved the conversion or commingling charges.[8] He did find that respondent's eleven month delay in rectifying his mistake violated D.R. 9-102(B)(4).
The commissioner's finding that respondent had not commingled funds was correct. The commissioner was also justified in finding that respondent's delay in making restitution violated D.R. 9-102(B)(4). However, we find that he erred in ruling that the conversion charge had not been proved. When the bank debited the trust account to satisfy respondent's personal loan obligations, Mrs. Lewis' money was clearly converted to respondent's benefit. In an attempt to avoid culpability, respondent claimed that the bank acted improperly and without his knowledge. The trust account bank statements, however, refuted respondent's contention. These records revealed that the bank's practice had begun long before November 19, 1981 (date debits in question were made).[9] Respondent could not claim to be ignorant of a practice which had been going on for almost a year. Therefore, when respondent did not meet his November loan obligations, he knew or should have known that the bank would debit his trust account, leaving insufficient funds to cover his check to Mrs. Lewis, i.e., that his client's money would be converted to his own use. This conduct violated rules 1-102 and 9-102. Accordingly, except as to the commingling charge, specifications 9 and 10 were proved.
Specification 4 (84-B-1458) alleged that:
In 1983, you settled a personal injury claim on behalf of Mr. Emmett A. Hamilton, and withheld the sum of $5,101.20 to pay medical expenses. Despite repeated requests, you failed, refused and neglected to pay said medical expenses and, as evidenced by your refusal to pay said expenses, did commingle and convert said sums to your own use. Your conduct in this matter, if proven, would constitute a violation of Disciplinary Rules 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, testimony established that respondent withheld $5,101.20 to pay Hamilton's medical debts to three doctors, Jacobs, Johnson and Phillips, and a hospital, St. Charles General. The record reflected that the payment of Dr. Jacobs' bill had been delayed at Hamilton's request and that another lawyer, retained by Hamilton before he hired respondent, had been responsible for paying Dr. Johnson's fee. Additionally, the record contained insufficient evidence to find that respondent had delayed payment to either Dr. Phillips or St. Charles General. Thus, evidence did not reveal any wrongdoing by respondent. He had not commingled or converted the funds, but had used them for their intended purpose. Accordingly, the commissioner concluded that the alleged violation of rules 1-102 and 9-102 had not been proved.[10] The commissioner's ruling was correct. The evidence was insufficient to prove that respondent had converted or commingled Hamilton's funds. Specification 4 of 84-B-1458 was not proved.

Failing to Return Funds Belonging to a Nonclient

D.R. 1-102
Specification 13 (84-B-1403) alleged that:

*335 [I]n connection with Specification No. 12 above, St. Paul Fire and Marine Insurance Company received and deposited your check issued on November 21, 1980, and retained a portion of monies due for premiums earned before said policy was cancelled. Check in the sum of $437.40, was returned to you in error by said Insurance Company, to reimburse you the excess of premiums actually earned. Your check, dated November 21, 1980, was then returned NSF and you did not make it good or return the sum of $437.40, paid to you in error before your check was returned NSF, and you have converted said funds to your own use; all in violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, Mark C. Landry, attorney for St. Paul Insurance Company, testified that respondent issued two NSF checks to St. Paul to pay for his insurance premiums. After the insurer had been unable to collect on the first $887.40 check, it cancelled respondent's policy. Subsequently, respondent sent the insurance company another check for the same amount. St. Paul determined that $450.00 was still owed on the cancelled policy. Without first making sure that respondent's second check cleared, the insurer refunded the surplus, $437.40, to respondent. After the second $887.40 check was returned NSF, St. Paul sent respondent a letter, dated June 15, 1981, in which it explained the mistake and asked him to return the refund. As of the hearing, he had not complied with this request.
The commissioner found that specification 13 of 84-B-1403 had been proved.[11] We agree with the commissioner's finding. By June of 1981, respondent knew that he was not entitled to the refund, yet as of the hearing, no restitution had been made. Therefore, respondent converted St. Paul's funds to his own use in violation of D.R. 1-102(A)(4) and (6).

Issuing NSF Checks to Nonclients

D.R. 1-102
In seven specifications of misconduct, involving seven different factual situations, the committee alleged that respondent issued numerous NSF checks in violation of D.R. 1-102. Specifications 1, 7, 12 and 14 of 84-B-1403 and 3, 7 and 8 of 84-B-1458 cover these allegations.
Specification 1 (84-B-1403) alleged that:
In August of 1980, you did issue a check drawn on your attorney account, in the sum of $411.60, payable to Clyde W. Smith Co. Inc., to pay rental due on office furniture provided to your office. Said check was returned NSF and you failed, refused and neglected to make said check good and did, in fact, issue a second NSF check in the sum of $250.00 on December 23, 1980, payable to said Clyde W. Smith Co. Inc., all in violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 7 (84-B-1403) alleged that:
On January 7, 1981, you did issue your check, drawn on your attorney account, the sum of $125.00 to the Louisiana State Bar Association. Said check was issued in payment of fee to attend a Continuing Legal Education Seminar. Said check was returned NSF and, despite repeated requests, you failed, refused and neglected to make said check good until September of 1981; all in violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 12 (84-B-1403) alleged that:
You did purchase a policy of insurance from St. Paul Fire and Marine Insurance Company. You paid a portion of the premium for said policy on February 23, 1980, when you issued check in the amount of $887.40, payable to said Insurance Co. Said check was returned NSF and you failed to make it good despite repeated requests to do so. Said policy *336 was cancelled and you issued a replacement check, dated November 21, 1980, in the sum of $887.40, which check was also returned NSF, and you failed, refused and neglected to make said check good; all in violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 14 (84-B-1403) alleged that:
In furtherance of the operation of your law firm, you did purchase certain legal publications from Matthew Bender & Co. and have, in payment, issued NSF checks, drawn on your attorney account and have failed, refused and neglected, despite repeated requests, to redeem said checks. Specifically, check in the sum of $640.00 was issued on October 15, 1980, and check in the sum of $500.00, was issued on February 12, 1982. Both checks were returned NSF and you have failed to make said checks good; all in violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 3 (84-B-1458) alleged that:
In furtherance of the operation of your law firm, you did engage the services of Ella Mae Smith Temporary Office Service, Inc., and, despite repeated requests, you failed, refused and neglected to pay for said services in the sum of $1,757.21. Further, you did attempt partial payment with check in the sum of $700.00, which was returned NSF. Your conduct in this matter, if proven, would constitute a violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 7 (84-B-1458) alleged that:
In furtherance of the operation of your law firm, you did retain the services of Temporaries Inc., and, despite repeated requests, you have failed, refused and neglected to pay for services rendered to your law firm. Further, you did attempt payment by issuing your check in the sum of $691.41, which was returned NSF. The misconduct alleged above, if proven, would constitute a violation, on your part, of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
Specification 8 (84-B-1458) alleged that:
In furtherance of the operation of your law firm, you did engage the services of Temporary Services Inc., and, despite repeated requests, failed, refused and neglected to pay for said services rendered to your law firm in the sum of $2,748.00, and did, in fact, attempt partial payment on March 4, 1983, by the issuance of your check in the sum of $692.00, which was returned NSF. The above-conduct, if proven, would constitute a violation of Disciplinary Rule 1-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.
The commissioner found that the committee proved all specifications except number 1 of 84-B-1403.[12] Specification 1 involved two NSF checks issued to a furniture retailer, one for $411.60 and another for $250.00. With respect to the former, respondent testified that he had inadvertently issued it for the wrong amount. After being informed of his mistake, he issued a replacement check for the correct amount, $539.28. This second check cleared. The commissioner accepted respondent's explanation. As for the $250.00 check, the witness who testified on behalf of the furniture company did not remember it nor was the check itself in the record. Therefore, the commissioner ruled that the evidence was insufficient to prove that the $250.00 check had been returned NSF.
We agree with the commissioner's finding. Specification 1 was not proved. The committee did, however, meet its burden of proof with respect to the other six specifications. By proving that respondent repeatedly *337 issued worthless checks, petitioner established a violation of D.R. 1-102. Specifically, respondent violated D.R. 1-102(A)(4) and (6). First, D.R. 1-102(A)(6) prohibits an attorney from engaging in any conduct "that adversely reflects on his fitness to practice law." As the commissioner stated "[t]he isolated or occasional issuance of an NSF check ... by itself ... may not be proof of dishonesty, fraud, deceit or misrepresentation, but a pattern of such problems is conduct which at the very least clearly reflects adversely on his fitness to practice law." Second, D.R. 1-102(A)(4) provides that an attorney shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." In addition to issuing numerous NSF checks, respondent ignored his payees' repeated requests for reimbursement and either unreasonably delayed or altogether failed to honor his checks. We find, as did the commissioner, that respondent's conduct was deceitful and dishonest.

Neglecting Legal Matters Entrusted to Him

D.R. 1-102 and D.R. 6-101[13]
The committee alleged that respondent failed to provide the contracted for legal services to three of his clients. These allegations were contained in specifications 8 and 11 of 84-B-1403 and specification 5 of 84-B-1458.
Specification 8 (84-B-1403) alleged that:
In April of 1981, you were retained by Mrs. Rosemary Hunt to represent the interest of her son in certain criminal proceedings and received a fee in the sum of $200.00. Despite repeated requests, you failed, refused and neglected to perform the work contracted for and failed, refused and neglected to reimburse Mrs. Hunt the fee paid since the work contracted for was not performed; all in violation of Disciplinary Rule 6-101(A)(3) of the Canons of Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, Mrs. Hunt testified that respondent never visited the jail to discuss the charges with her son and failed to appear at her son's arraignment. She added that, to her knowledge, respondent did nothing to earn his fee. After Mrs. Hunt complained to the association, respondent contacted her and paid back one half of the $200.00 retainer. He kept the other half as a fee. Respondent testified that it was not his fault that Mrs. Hunt received little or no legal service. He had two excuses. First, he claimed that he had told Mrs. Hunt that no services would be performed until the balance of the $1000 fee had been paid. Next, he contended that the case had not been his responsibility; his associate had been in charge of the matter, and she had neglected it. The commissioner rejected both of respondent's excuses finding that specification 8 had been proved.[14]
We agree with the commissioner's finding. Mrs. Hunt paid respondent a retainer to secure representation for her son. No legal services were provided. Respondent's attempts to justify his conduct were unpersuasive. He had neglected a legal matter entrusted to him and thus violated rules 1-102 and 6-101(A)(3).
Specification 11 (84-B-1403) alleged that:
In October of 1981, you were retained to represent Mr. James F. Sharp in the preparation of a will. Despite payment of a fee for your services and repeated requests, you failed, refused and neglected to prepare the work contracted for and failed to communicate with your client, concerning the matter contracted for; all in violation of Disciplinary Rule 1-102 and 6-101(A)(3) of the Canons of *338 Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, Sharp testified that he paid respondent $100.00 (of a $200.00 fee) to prepare a will within five days. Respondent did not do so. Repeated attempts by Sharp to contact respondent failed. Respondent testified that he had been unable to prepare a will within five days because research revealed the complexity of Sharp's problem. He also needed additional information which Sharp never provided. The commissioner accepted respondent's explanation and ruled that specification 11 had not been proved. The commissioner found, however, that respondent had violated rule 6-101(A)(1), a violation not alleged in the specification.[15]
We find that the commissioner correctly found that specification 11 had not been proved. We also find, however, that he erred in ruling that respondent had violated D.R. 6-101(A)(1). Respondent agreed to draw up a simple will. The evidence did not establish that he was unqualified to perform this task. Accordingly, a violation of D.R. 6-101(A)(1) was not proved.
Specification 5 (84-B-1458) alleged that:
You were retained to represent Robert Provost in criminal proceedings and were paid a fee of $2,500.00 by Gloria Provost and Harry Provost. Despite payment of said fee, you performed little or no work on behalf of your client. You failed to appear for scheduled court appearances and caused your client to remain imprisoned for an unnecessary period of time. Further, you failed, refused and neglected to reimburse your client's fee when demand was made upon you. The above-conduct, if proven, would constitute a violation of Disciplinary Rules 1-102 and 6-101(A)(3) of the Canons of Professional Responsibility for the Louisiana State Bar Association.
At the formal investigative hearing, testimony revealed that Mrs. Provost, and other family members, wanted Robert to plead guilty. Respondent contended that he resisted this pressure because he believed Robert was innocent. In addition, evidence established that respondent did not show up timely for Robert's May 10, 1983 court date. The trial was rescheduled for May 13, 1983. This time, respondent made no appearance. In the absence of his attorney, Robert succumbed to familial pressure and pled guilty.
The commissioner found that specification 5 had been proved. He reasoned that
it was respondent's duty not only to appear timely, as he failed to do on May 10, but particularly to appear, as he failed to do at all on May 13, 1983, dates upon which Robert Provost's trial had been. The record clearly establishes that respondent was aware that his client was exposed to strong pressures from his family to take action which he, the attorney for the young man, felt was not in his client's best interest. Considering the facts of the case, as he understood them, the pressures on his client, his client's age, and the seriousness of the crime, respondent's neglect of his duty is particularly serious.
We agree. By failing to appear for the two court dates, respondent violated Disciplinary Rules 1-102 and 6-101(A)(3).

Discipline
The purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession and to deter other lawyers from engaging in violations of the Code of Professional Responsibility. The discipline to be imposed will depend upon the seriousness of the offense involved and the facts and circumstances of each case. The court will take into account both aggravating and mitigating circumstances. Louisiana Bar Association v. Dowd, 445 So.2d 723 (La.1984); Louisiana State Bar Association v. Whittington, 459 So.2d 520 (La.1984).
Having found respondent guilty of twelve specifications of misconduct, we consider that disciplinary action is warranted. *339 [16] Respondent's most serious violation of the rules occurred when he converted funds belonging to his client Mrs. Lewis. Respondent did make restitution to Mrs. Lewis. Restitution is, of course, a mitigating factor. The record revealed, however, that this accounting did not occur until after the formal investigative hearing had begun, leading to the inference that restitution might not have been made except for the disciplinary proceedings. Under these circumstances, we consider that disbarment is the appropriate penalty.

Decree
For the reasons assigned, it is ordered, adjudged and decreed that the name of Larry Preston Williams be stricken from the roll of attorneys and his license to practice law in Louisiana be cancelled. Respondent is to bear all costs of these proceedings.

ON REHEARING
PER CURIAM.
We grant a rehearing in this matter to reconsider the penalty imposed upon respondent, Larry Preston Williams. After considering other cases involving similar circumstances, we believe that a penalty of disbarment in this case is too severe a sanction. Rather, we find that a suspension from the practice of law for a period of three years is the appropriate disciplinary action in this matter. LSBA v. Wilkins, 449 So.2d 1013 (La. 1984) (on rehearing).

DECREE
For the reasons assigned, it is ordered that Larry Preston Williams be suspended from the practice of law in the State of Louisiana for a period of three years. All costs of these proceedings are cast against respondent.
NOTES
[1] This hearing was held on September 17, October 7, 8, and 29, 1982.
[2] The committee found that the evidence did not support the charges set forth in specifications 4 and 5 (concerning alleged violations of D.R. 6-101(A)(3)) and therefore dismissed them.
[3] The committee found that the evidence did not support the charges set forth in specifications 6 (involving an alleged violation of D.R. 6-101(A)(3)) and 9 (involving an alleged violation of D.R. 6-101(A)(3) and D.R. 1-102)) and therefore dismissed them.
[4] Specification 6 of 84-B-1403 (involving an alleged violation of rules 1-102 and 6-101(A)(3)) and specifications 1 and 2 of 84-B-1458 (involving alleged violations of rule 1-102) are not before us because the committee concurred in the commissioner's findings that they had not been proved.
[5] D.R. 1-102 provides that:

(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
D.R. 9-102 provides that:
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
[6] The committee disagreed with this finding.
[7] The evidence revealed that respondent deposited the insurance company's check on November 13, 1981 and that it was credited to his account three days later.
[8] The committee disagreed with this finding.
[9] Trust account bank statements revealed debits in the amounts of: $526.90 on December 30, 1980; $1,025 on June 4, 1981; $114.70, $723.67 and $563.37 on July 24, 1981; $250.00 on July 29, 1981; $100.00 on October 1, 1981; $1,808.49 on October 14, 1981; $234.40, $728.67 and $568.37 on November 19, 1981; $305.00 on December 7, 1981; $573.37 and $733.67 on December 30, 1981; $50.50 on January 8, 1982; and $568.37 on January 27, 1982; (numerous small amounts were also debited during this period).
[10] The committee disagreed with this finding.
[11] The committee concurred in this finding.
[12] The committee concurred in this finding except that it believed that Specification 1 had also been proved.
[13] D.R. 6-101 provides that:

(A) A lawyer shall not:
(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.
(2) Handle a legal matter without preparation adequate in the circumstances.
(3) Neglect a legal matter entrusted to him.
[14] The committee concurred in this finding.
[15] The committee concurred in this finding.
[16] Based upon his findings, the commissioner recommended a five year suspension from the practice of law with the qualification that this court allow respondent to resume the practice of law after three months active suspension upon respondent's proving that: (1) he has established, and will maintain during the five-year suspension period, separate expense and client trust accounts at a bank where he has no financial obligations; (2) he has paid all NSF checks which were the subjects of proved specifications (excepting the checks to St. Paul); (3) he has refunded to Mrs. Provost the $2500.00 he owes her; and (4) he has returned to St. Paul the $437.40 refunded to him in error. Additionally, the commissioner provided that if respondent, after having his license restored, incurs financial obligations at the bank where he keeps his expense and trust accounts, his license should be unconditionally revoked for the remainder of the five-year period.

Based upon its findings, the committee recommended disbarment conditioning readmission upon respondent's proving that: (1) he has established and will maintain expense and client trust accounts in a bank where he has no financial obligations; (2) all NSF checks set forth in the proved specifications have been made good; and (3) he has reimbursed all persons whose funds he converted.