512 So.2d 404 (1987)
LOUISIANA STATE BAR ASSOCIATION
v.
Larry Preston WILLIAMS.
Nos. 85-B-1359, 86-B-0230.
Supreme Court of Louisiana.
September 9, 1987.
Rehearing Denied October 29, 1987.
*405 Thomas O. Collins, Jr., G. Fred Ours, New Orleans, Gerard F. Thomas, Jr., Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee, Metairie, for applicant.
*406 Larry Preston Williams, New Orleans, for respondent.
LEMMON, Justice.
These are two consolidated disciplinary proceedings against Larry Preston Williams, a Louisiana attorney who is presently under suspension by this court.[1] The present proceedings, filed after nine investigatory hearings, include nine specifications of misconduct involving respondent's dealings with five different clients. The commissioner appointed by this court conducted three separate hearings and filed a report, finding respondent guilty of misconduct in regard to six specifications.[2] The commissioner did not make a penalty recommendation.
After reviewing the records of all hearings, which are separately discussed hereinafter under subheadings indicating the complaining client, we conclude that respondent's serious and persistent violations of the disciplinary rules, especially when considered with his prior disciplinary violations that led to his suspension, warrant his disbarment from the practice of law.[3]
Succession of Ruth Jones
There were originally two specifications of misconduct against respondent in connection with the handling of this succession.[4] The only specification still at issue is that respondent, in his capacity as succession attorney, received $1,400 in succession funds and converted the funds to his personal use in violation of DR 1-102(A) and 9-102 of the Code of Professional Responsibility.[5]
Shortly after the death of Ruth Jones on February 4, 1981, Margaret Jones, the decedent's grandniece, employed respondent to handle the succession and paid him a retainer. Margaret Jones desired to purchase the house which decedent had owned. She also requested that respondent recover *407 from Mildred Boucree, the wife of decedent's nephew, the sum of $2,000 which Boucree had withdrawn from decedent's bank account on the day of decedent's death.
On October 5, 1981, Boucree gave respondent, as the succession attorney, the sum of $1,400 in partial return of the funds which had been withdrawn. Respondent then wrote to Margaret Jones and another heir, informing them of the receipt from Boucree of $1,400 "as partial payment for monies deducted from Ms. Ruth Martin Jones account after her deceased (sic)." Respondent further stated that Boucree had indicated she had receipts and documentation for the expenditures of the balance of the withdrawn funds. Respondent never placed these funds in a trust account, never opened a succession account, and never accounted for the funds.
At the investigatory hearing, respondent introduced a ledger sheet showing that the $1,400 received from Boucree was entered as advanced costs, but did not produce any further documentation then or at the commissioner's hearing to establish the disposition of any part of these funds.
In a deposition taken after the commissioner's hearing, respondent obtained a concession from Margaret Jones that she and respondent had an understanding, from the time the funds were collected from Boucree, that the money would be used to defray expenses. She stated that when she asked him to pay the balance of the funeral bill and bills for water and insurance on decedent's home, he immediately gave her cashier's checks for these expenses.[6] She also stated that her complaint to the Bar Association had nothing to do with his handling of the $1,400 in succession funds.[7]
The commissioner found that respondent did not deposit the $1,400 in a trust account nor keep the client's funds separate from his own funds, and did not have records showing how the funds were spent and how much remained. The commissioner accordingly concluded that respondent's failures to use a trust or other separate account for the succession funds, to render an accounting, and to keep accurate records were violations of DR 1-102(A) and 9-102.
When the Bar Association proves that an attorney failed to deposit his client's funds in an identifiable bank account separate from the attorney's own funds in violation of DR 9-102(A), the burden is on the attorney to show that there was no commingling or conversion of the client's funds. Louisiana State Bar Association v. Krasnoff, 488 So.2d 1002 (La. 1986). Here, respondent proved only that he used an unspecified amount of funds that he had collected on behalf of the succession to pay succession expenses at some point in time long after the funds were collected. In the meantime he presumably used the funds for his personal purposes, rather than keeping them in an identifiable separate account. He also clearly violated DR 9-102(B)(3) by failing to maintain complete records of his client's funds and to render an appropriate accounting.
Respondent argues, however, that DR 9-102(A) contains an exception for client's funds advanced for costs and expenses. This exception is simply inapplicable in this case. Advances by the client for costs or expenses need not be deposited in an identifiable separate account when the specific costs or expenses have already been incurred or are readily determinable in amount and will become due immediately. An advance of client's funds for unspecified *408 costs or expenses that may become due in the future must be deposited in a trust account, inasmuch as the separation of the funds pending future use on the client's behalf is one of the very purposes of the requirement of a trust account.
The only redeeming feature of respondent's misconduct in this case is that he did have part of the commingled funds available when the client requested payment of certain expenses. This fact, however, serves merely as a mitigating factor in determining the penalty for the violations of the disciplinary rules.
Erin Hunter
In this matter respondent is charged with failure to refund the unearned portion of a fee paid to respondent to represent Erin Hunter in a criminal case in violation of DR 1-102 and DR 2-110(A)(3).[8]
At the investigatory hearing, Monica Bland, Hunter's mother, testified that she employed respondent on July 18, 1984, to defend her son. On July 23, 1984, Bland paid respondent the sum of $2,000, which was the agreed fee to represent Hunter through pretrial and trial proceedings. Bland discharged respondent on August 21, 1984, alleging he had failed to show up for three or four court dates.[9] When Bland requested a refund of the unearned portion of the fee, respondent indicated that he would make a refund the next day. After failing to reach respondent by telephone, she wrote to him and again requested a refund but received no response. Later respondent went to Bland's home and asked to be rehired. When she declined, respondent offered a $600 refund, but Bland said that was not sufficient. Respondent said he would get back to her, but she never heard from him again.
Hunter testified that respondent visited him in jail briefly on one occasion and appeared in court twice, once (the day the fee was paid) to announce his representation and the second time (the day respondent was discharged) to secure a bail reduction.
Respondent testified that he missed two court dates because of illness, a fact borne out by the court records, and that he notified Mrs. Bland on the first occasion, but not on the second. He claimed that he reviewed Hunter's juvenile records and contacted Southern University about Hunter's possible enrollment on the same day that he successfully moved for a bail reduction. He then negotiated a plea bargain with a two-year sentence, but Mrs. Bland refused to agree.
Respondent estimated that he had performed about ten hours of work, but he had no records to support the estimate. He conceded on the record that a refund of $1,000 was due and stated that he had offered Mrs. Bland the sum of $1,000 in settlement of the dispute. He admitted, however, that he had never made an unconditional tender (as opposed to an offer of compromise) or payment to her for that amount, although both parties agreed that at least a $1,000 refund was due.
At the commissioner's hearing, respondent argued that it is doubtful whether any refund was due because the plea bargain he negotiated was more favorable than the eventual sentence (a suspended five-year sentence with no jail time).[10] He contended that he had offered to make a refund only for public relation purposes.
The determination whether a fee paid in advance of services is classified as the client's funds or as the attorney's funds turns on the purpose of the payment. A retainer which secures the attorney's general availability to the client and which is not related to the fee for a particular representation constitutes the attorney's funds *409 and need not be placed in a trust account. On the other hand, an advanced fee for particular services not yet performed constitutes funds of the client which should be placed in a trust account and not withdrawn or withheld without the consent of the client. Lawyers' Manual on Professional Conduct § 45:101 (1984).
Here, the fee was for particular services not yet performed and constituted funds of the client which should have been placed in a trust account.[11] While some services were performed, clearly a large portion of the advanced fee was not earned. Respondent was bound to refund unconditionally (and not as an offer of settlement) some amount which reasonably represented the unearned portion of the advanced fee, leaving the parties free to litigate in a civil action over the disputed portion of the fee. It is debatable whether respondent could properly withhold from the client the portion of the funds which formed the basis of the fee dispute.[12] It is beyond question, however, that respondent could not properly withhold from the client the portion of the funds which admittedly were not earned. Respondent's withholding the entire advanced fee in order to maintain leverage against his own client was a breach of professional responsibility which warrants disciplinary action.
Kathleen G. Castain
The specifications in this matter charged that respondent commingled and converted to his own use the funds from the settlement of a worker's compensation case and that he failed to keep his client's portion of the funds in an identifiable separate bank account or to pay the funds to her promptly, all in violation of DR 1-102(A) and 9-102. Respondent was also alleged to have charged a fee in excess of the statutory limitation for worker's compensation cases in violation of DR 1-102(A) and 2-106(A).
At the investigatory hearing Castain testified that respondent settled her worker's compensation claim for $17,500. Respondent had originally told her the fee would be one-third of the recovery. When she appeared in court on August 12, 1983 for approval of the settlement, she learned of the statutory limitation on the fee. However, respondent told her the difficulty of the case warranted the higher fee of one-third of the settlement. He also told her that the funds would not be available until the draft cleared the bank, which would take about thirty days. She requested that the funds be paid in full as soon as available. She also requested payment in cash so that her husband (with whom she was then having domestic problems) could not claim any of the funds to which he was not entitled.
On September 1, respondent gave Castain $100 and informed her that the draft had not cleared, although as a matter of fact the funds had been available since the August 12 deposit of the draft. On October 6, respondent paid his client $4,200 of the $14,750 that was her share of the settlement proceeds (when statutory limitation is applied). Between October 7 and November 1, Castain persistently hounded respondent for her funds, and respondent paid her four additional payments of $4,000, $1,500, $1,950 and $1,400 respectively, telling her each time that he could not pay the full amount, at first because the settlement check had not cleared and later because of personal problems. Respondent did not pay the remaining $1,700 until August, 1984, although Castain tried to contact him on numerous occasions. Castain testified that the last payment represented the balance of the difference between a one-third fee and the statutory fee.
Presenting his own version of the incident, respondent testified that Castain instructed him not to disclose the settlement to her husband because of their current marital problems and not to place the funds *410 in a bank account where they could be traced. He therefore deposited the $17,500 check into his account on the day of the settlement and immediately withdrew two-thirds of that amount, placing the cash in an envelope in a safe in his home.[13] He disbursed the funds to her whenever she requested a payment, marking a debit on the ledger sheet in the envelope.
Respondent asserted that he had used this same procedure for other clients who wanted to keep spouses or relatives in the dark about settlement funds. Although he was aware of the disciplinary rule requiring the placing of client's funds in an identifiable separate bank account, he believed this procedure did not violate the rule, as long as the client was aware of and consented to the procedure.
Upon cross-examination, respondent stated that Castain first wanted to keep the handling of funds secret from the husband and later from her brother, who was pressing her to obtain part of the funds. Accordingly, when Castain and her brother (who accompanied Castain on every office visit because of her incapacity) confronted him on October 6, he put on a show for the brother's benefit, telling them that the settlement check still had not cleared the bank, but giving her $4,200 in cash. The brother then demanded that they talk to a judge who was the brother's friend. When Castain (who was also acting, according to respondent) demanded the total amount immediately, he agreed in front of the judge to pay the remaining $7,400 by 3:00 p.m. the next day.[14] He met Castain and her brother the next night at a restaurant and paid her $4,000 in cash. Four days later he gave her $1,500 in cash, and two days after that gave her a $1,950 check, explaining that he met her in town and did not have time to go to his home to get cash from the safe.[15]
On November 1, 1983, according to respondent, he paid Castain $1,400 in cash. She then returned to California to undergo surgery, telling respondent to keep the remainder of the funds until she returned to New Orleans because she wanted to be paid in cash. She did not return to New Orleans until August, 1984, and he paid her the remaining $1,700 from the safe. (In the meantime, Castain filed the complaint with the Bar Association in December, 1983.)
In support of his version of the incident, respondent introduced a June 10, 1984 letter from Castain to the Bar Association, requesting withdrawal of her formal complaint, and an undated affidavit by Castain, attesting that she requested respondent to keep her portion of the funds other than in a bank account and to pay her in several installments that would not appear in his regular journals. The affidavit further asserted that the disbursements between October 6, 1983 and November 1, 1983 were made in accordance with her instructions.[16]
When presented with the letter and affidavit at the June 13, 1985 investigatory hearing, Castain explained that she signed the letter and the affidavit (which were *411 both prepared by respondent) because she didn't want to be subpoenaed to return to Louisiana for a hearing. (Indeed, she had already failed to show up after being subpoenaed for a May 29, 1985 hearing.) Although she admitted that she had requested payments in cash and that she had filed the complaint primarily because respondent had communicated with her husband, she denied that she requested respondent to pay her in installments or not to use a trust account. She emphasized that all she wanted was to get the full amount of her settlement in cash as soon as possible so that she could return to California for major surgery. She also directly contradicted respondent by testifying that she never received a settlement statement from him. She further pointed out that the amount of the settlement was in the public court records and that any attempt to conceal this information by the subterfuges claimed to have been employed by respondent would have been useless.
The commissioner found as facts that respondent lied to his client about the settlement draft's not clearing the bank, that he failed to pay the proceeds in a lump sum contrary to his client's wishes, and that he did not keep the client's funds separately in a safe in his home. The commissioner further noted that there was no evidence to show whether or not respondent had sufficient funds in his bank accounts to pay the amount due his client. Accordingly, the commissioner concluded the Bar Association proved that respondent failed to keep his client's funds in an identifiable separate bank account or to pay the client's funds properly and that respondent charged an excessive fee, but failed to prove commingling and conversion. Both sides objected in part to these conclusions.
As to the findings of fact, respondent's testimony was both inconsistent and incredible. In his testimony in three separate hearings, respondent contradicted logic as well as his previous statements. He would have this court believe that his client requested an elaborate subterfuge to conceal facts (the date and amount of the settlement) that were matters of public record and that he went to incredible extremes (such as lying to a judge or making special trips from his office to his home or arranging special meetings at night to make the payments) to carry out this subterfuge.[17] His direct contradictions are numerous: his assertion at the June 28,1985 investigatory hearing that immediately upon deposit of the settlement draft he withdrew two-thirds of the deposit (about $11,600) and placed it in his safe, later contradicted by his statement at the June 11, 1986 commissioner's hearing that he withdrew $14,750 ($17,500 minus the statutory fee of $2,750); his assertion that he did not charge a one-third fee, later changed (when shown a written notation in the judge's office totaling the client's share at two-thirds) to not collecting a one-third fee; his statement at the June 28, 1985 hearing that he did not become aware of the statutory limitation of compensation fee until "maybe last year", contradicted by his later admission that they talked about the limitation with the judge at the settlement (TR 99); his production of a ledger sheet at the last of several hearings on the matter, stating that the document had just been found in one of the boxes in his garage since a June, 1984 office move, when the document contained an entry on August, 1984; his assertion that Castain had instructed him in November, 1985 to keep the remaining $1,700 in his safe until she returned to New Orleans because she wanted cash only, when she had accepted a check two weeks earlier and then filed a complaint with the Bar Association *412 the following month; and numerous other inconsistencies.
We therefore conclude that the Bar Association proved by clear and convincing evidence that respondent failed to maintain his client's funds in an identifiable bank account separate from his funds and failed to deliver promptly his client's funds, in violation of DR 9-102(A) and (B)(4) and 1-102.
We also conclude that respondent commingled his client's funds and converted them to his own use in violation of DR 1-102(A) and 9-102. As we noted earlier in the Succession of Ruth Jones matter, when the Bar Association proves that an attorney failed to deposit his client's funds in an identifiable bank account separate from the attorney's own funds in violation of DR 9-102(A), the burden is on the attorney to show that there was no commingling or conversion of the client's funds. Here, respondent claims that he kept the funds in cash segregated in his safe upon his client's instructions and disbursed the funds piecemeal upon his client's request. The commissioner rejected this incredible story, and we do also.[18] Here, the client denied making such a strange request, and logic as well as the contradictions in respondent's testimony justify rejection of respondent's version.
In mitigation of this specification, however, we note that respondent did deliver most of the client's funds in a three-week period within one and one-half months of the settlement.[19] However, he did severely inconvenience his client during the period that he unjustifiably withheld the funds which he undoubtedly put to his own use temporarily.
As to the excessive fee, the Bar Association proved by clear and convincing evidence that respondent entered into an agreement for a fee in excess of the statutory limitation. Even under respondent's own testimony (or at least one contradictory version thereof), he was informed of the statutory limitation by the judge at the time of the settlement, yet he set aside only two-thirds of the settlement proceeds as the client's share. Moreover, his October 13 payment brought to total amount paid to approximately two-thirds of the settlement, and his November 1 payment was marked "compensation of inconvenience". The final payment, not made until almost a year later (and shortly after respondent obtained a letter from Castain withdrawing the complaint), admittedly gave the client the full amount to which she was entitled after deduction of the statutory fee. However, respondent entered into an agreement for and attempted to charge an excessive fee in violation of DR 2-106(A) and 1-102(A), although he ultimately collected only the maximum statutory fee.[20]
Darrell Mitchell
In this matter respondent was charged with failing to return the sum of $1,613 paid by his client's parents for the cost of a transcript in an appeal from the client's criminal conviction in violation of DR 1-102(A) and 9-102(B)(4).
Respondent defended Darrell Mitchell in the criminal trial which resulted in a conviction. Respondent was paid the fee that he earned for this representation. After the trial, respondent filed a timely appeal on behalf of his client, but the parents did not furnish respondent the $1,613 for the cost of the transcript in the appeal until November 1, 1983.[21] At the time respondent accepted *413 the payment, the appeal had already been dismissed at a hearing attended by respondent. When the appeal bond was cancelled, Mitchell was returned to jail.
Mitchell's mother testified at the investigatory hearing that when she learned from the court that the costs of the transcript had never been paid, she and her husband demanded a refund of the money from respondent many times without success. They filed a complaint with the Bar Association in January, 1984. In May, 1984, respondent gave the Mitchells a check for $1,613, but they could not cash the check because it was not signed by respondent. The Mitchells finally received the money on November 1, 1984, when respondent delivered a certified check to the lawyer the Mitchells had hired after terminating respondent's services.
Respondent testified at the investigatory hearing that he received the $1,613 in cash and kept it locked in an envelope in his desk drawer. He accepted the money, even though the appeal had already been dismissed, because he hoped to reinstate the appeal, but he never filed such a motion. He explained that he and Darrell Mitchell agreed to wait on the outcome of a motion to reduce the sentence before attempting to reinstate the appeal. In the meantime he informed the Mitchells that he would attempt to have their son transferred to Orleans Parish Prison and offered to return the money, but they told him to hold the funds pending the outcome of his efforts. When the motion for sentence reduction (which had been filed on March 19, 1984) was denied and his relationship with the Mitchells had deteriorated, he called Mr. Mitchell on May 31, 1984 to pick up the check, but forgot to sign it.[22] He then deposited the cash, along with an unrelated check, into his bank account the next day.[23] He explained that he had not deposited the cash into his bank account when it was first received because he was having problems with unauthorized debits.
After the commissioner's hearing, the commissioner found that respondent accepted the funds for processing the appeal record without informing the Mitchells that the appeal had been dismissed or that he was not going to use the funds for the intended purpose; that respondent did not keep the clients' funds in an identifiable bank account; that respondent converted the funds to his own use; and that respondent, after the complaint to the Bar Association about his failure to return the funds, gave Mr. Mitchell an unsigned check in May, 1984 and did not actually return the funds until November 1, 1984. The commissioner accordingly concluded that respondent had violated DR 1-102(A) and 9-102(A) and (B).
Respondent clearly violated DR 9-102(A) by failing to deposit his client's funds in an identifiable bank account separate from his own funds.[24] Moreover, as in the Succession of Jones and the Castain matters, respondent failed to bear his burden of proving that he did not commingle or convert the client's funds. His testimony about keeping the funds in an envelope in his desk was inconsistent and incredible, and the bank records showed that his trust account frequently fell below the amount of the funds he held for the client.
Respondent also clearly violated DR 9-102(B)(3) and (4) by failing to render a proper accounting of the clients' funds *414 and to deliver the funds to the clients promptly upon request. His misuse of his client's funds and failure to comply with the demand for return of the funds constituted a clear violation of DR 1-102 by engaging in conduct that is prejudicial to the administration of justice.
There is no suggestion of any mitigating factors except that respondent has finally given the funds back to the client through their new lawyer.
Michelle Snowden
The specifications in this matter charged respondent with failing to pay a doctor's bill with funds withheld from a personal injury settlement for that purpose and with converting the funds to his own use in violation of DR 9-102(A) and (B), 7-101(A)(3), 6-103(A)(3) and 1-102(A).
Respondent represented Snowden in a personal injury case. When the case was settled in March, 1984, respondent withheld the sum of $2,005 for the express purpose of paying a medical bill incurred by the client for treatment of the injury. The complaint to the Bar Association on October 9, 1984 asserted that the bill had not been paid.
In answer to the complaint, respondent stated that he had employed the services of that particular doctor and that he believed that only he (and not the client) was obligated to pay the bill. Therefore, he considered the dispute over the bill to be a civil matter between him and the doctor and not a matter with which the Bar Association should be concerned.
At the investigatory hearing on August 22, 1985, the doctor testified that his total bill for treatment was $2,500 and that all but $964.32 had been paid by the client's father's health insurance company. The balance remained unpaid despite numerous bills to both respondent and the client.
At the investigatory hearing on a later date, respondent testified that he placed the funds in his trust account. A dispute developed as to the balance due, the doctor claiming that $2,005 was due and the client claiming the balance was much less because of the health insurance payment. When they were unable to resolve the dispute in three or four telephone conversations, he turned the funds over to Snowden's father on March 31, 1984 (fifteen days after the settlement) in order to let him resolve the dispute over the amount paid by his insurer. He gave Snowden's father cash, using funds he received that day when he closed his trust account in that particular bank.[25] He stated further that since the doctor in his testimony had reduced the demand to $964.32, he was willing to pay that amount.
At the final of three commissioner's hearings, respondent introduced a receipt for $2,005, which was typed on plain stationery and allegedly dated and signed by Snowden's father on April 5, 1984. Respondent had subpoenaed Snowden's father for several hearings and for a deposition after the final hearing, but the witness never appeared.
The commissioner found that respondent's testimony about a refund to Snowden's father shortly after the settlement was unbelievable. He noted the inconsistent positions taken by respondent: in his response to the complaint by the doctor, respondent asserted that the dispute was a civil matter between him and the doctor; at the investigatory hearing, respondent claimed that he had refunded the money in cash shortly after the settlement to his client's father, because he had difficulty contacting the client; and later respondent declared that he had returned the money to the client's father because that party might be liable on a subrogation claim by his health insurer. The commissioner stated that respondent should have kept the money in an identifiable bank account, paid the doctor the amount due after the health insurer's payment, and remitted the balance to his client by check, advising that *415 the health insurer may seek subrogation for the amounts paid to the debtor.
The commissioner concluded that respondent violated the disciplinary rules by failing to keep Snowden's funds in a trust account; by converting the funds to his own use; by failing to render an accounting or to deliver the funds promptly to the client; by failing to pay the bill with the funds withheld for that purpose, thereby damaging his client's reputation; by neglecting a legal matter entrusted to him; by acting in a manner prejudicial to the administration of justice, thereby discouraging members of the medical community from dealing with attorneys; and by giving such illogical and unbelievable explantions of his conduct as to reflect adversely on his fitness to practice law.
Respondent violated DR 9-102(A) by failing to deposit his client's funds into an identifiable bank account separate from his funds. His testimony that he deposited his client's funds into his trust account was not supported by any readily available evidence of such a deposit or by a check drawn on the account for any payment to or on behalf of the client.[26] Indeed, one of the purposes of requiring attorneys to use trust accounts in handling clients' funds is to prevent a swearing match between the attorney and the client over payments to or on behalf of the client.
The April 5, 1984 receipt produced by respondent was even more suspect. Snowden's letter to the Bar Association on January 23, 1985 about helping her and the doctor solve "this problem with my lawyer" did not mention any refund. Respondent himself did not mention any refund when he was first notified of a complaint that he had not used funds withheld from his client's settlement to pay the doctor bill. Finally, his explanation that he gave cash to the client's father with funds from the closing of the trust account, rather than writing a check to the client on the trust account, because he was afraid the settlement check had not cleared, simply does not make sense. The settlement check (if deposited in the trust account) had necessarily cleared when he closed the account on April 3, two days before he allegedly paid the cash to the client's father.
The most serious transgression, aside from lying to the client and to the Bar Association, was respondent's failure to deliver the funds to his client upon demand, a violation of DR 9-102(B)(4). This failure has caused much distress to his client and has reflected on her reputation because a bill owed by her is still outstanding.
Discipline
Respondent was well aware of the disciplinary rules regarding trust accounts and the handling of clients' funds. Indeed, at the time of the events giving rise to these complaints, respondent had already gone through the disciplinary hearings which led to his previous suspension. Nevertheless, respondent deliberately chose to ignore these rules by commingling clients' funds with his own and spending these funds as if they were his own. Admittedly, he was able to and did repay the funds eventually (except in the Hunter and the Snowden matters) so that arguably the funds were not truly at risk, but these records of twelve hearings are replete with clients' testimony about unheeded demands for the return of funds. This is hardly the type of conduct which endears lawyers to clients, even if the clients are eventually paid. The misuse of clients' funds was compounded by helter-skelter office practices which provided no written accounting to the client and which suggested that the lawyer was "robbing Peter to pay Paul". Other proved abuses were the failure to refund the admittedly unearned portion of an advanced fee, the attempt to charge an excessive fee, and the failure to pay medical bills with settlement funds withheld for that purpose. The proved persistent misconduct warrants severe sanctions.
*416 This court in Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La. 1986), set forth guidelines for imposing sanctions in cases of commingling and conversion of clients' funds in violation of DR 9-102.[27] Some of the elements listed in Hinrichs as warranting disbarment are present in this case. The attorney made serious misrepresentations to the clients in connection with the violations, and the attorney either failed to make full restitution or did so tardily and only after pressure of disciplinary proceedings. However, the magnitude and the duration of the deprivation were generally not extensive, and the risk of damage was generally not great, although the inconvenience was.
Absent aggravating and mitigating circumstances and proof of other misconduct, the violations of DR 9-102 alone would arguably warrant disbarment (or at least a three-year suspension). However, there was proof of other misconduct unrelated to conversion. Of equal significance are the facts that there are multiple conversion claims in these consolidated cases and that respondent is already under suspension for previous conversions and related violations which occurred shortly before the events at issue here. Aggravating factors include prior disciplinary offenses, a pattern of misconduct, and multiple offenses in the present proceeding. Standards for Imposing Lawyer Sanctions § 9.22 (1986).
On the other hand, the only factor in mitigation, except for restitution in some matters, was brought out by character witnesses.[28] Four of respondent's former clients testified that respondent handled matters for them in a competent manner and charged very reasonable fees. A criminal judge testified that respondent "did an adequate job" in two capital cases to which he had been appointed, and the parties stipulated that two other criminal judges would give similar testimony.[29]
Considering respondent's persistent misconduct in these multiple matters and his deliberate disregard for the basic disciplinary rules despite his experience in prior offenses, we conclude that respondent should be disbarred from the practice of law.
Procedural Issues
Respondent, by answer and amended answer, raised several procedural issues.
Respondent first contended that a majority of the Committee on Professional Responsibility did not vote to file a disciplinary action against him. The Bar Association's answers to interrogatories indicate the contrary.
Respondent also contended that the Committee committed non-specific violations of La. Const. art. I, §§ 2, 3, 4 and 12, and of the Due Process and Equal Protection Clauses of the United States Constitution with respect to discrimination based on race. He also contended, in a non-specific manner, that the Committee was improperly constituted in that the members were not properly recommended by the Board of Governors nor properly appointed by this court. The commissioner declined to permit evidence on these allegations, ruling that such matters were beyond the scope of his appointment and suggesting that respondent file appropriate pleadings in this court.
The commissioner ruled correctly. This court is a court of original jurisdiction in disciplinary proceedings, and commissioners are appointed on a case-by-case basis for the purpose of receiving evidence and reporting findings of fact and conclusions *417 of law. Articles of Incorporation, Louisiana State Bar Association, art. 15, § 6(b) and (d). Respondent could have, but did not, apply to this court with specific complaints about discriminatory treatment. Moreover, the record contains no hint whatsoever of discrimination, but rather suggests that both the Bar Association and the commissioner treated respondent very fairly, as, for example, by excusing him from numerous failures to present evidence timely and from other missed deadlines.
Finally, it is this court, and not the Committee nor the commissioner, which is the sole arbiter of lawyer discipline. The decision in this case is based on the complete record of extensive proceedings at which respondent was afforded every opportunity to participate.
Decree
It is ordered that the name of Larry Preston Williams be stricken from the roll of attorneys and that his license to practice law be cancelled, effective upon the finality of this decision. Respondent's previous suspension is to run concurrently with his disbarment. All costs of the proceedings are assessed to respondent.
NOTES
[1] In Louisiana State Bar Association v. Williams, 479 So.2d 329 (La.1985), this court disbarred respondent on original hearing, but on rehearing the court determined the sanction was too severe after consideration of other cases involving similar circumstances and imposed a three-year suspension.
[2] The Bar Association concurred in the dismissal of two specifications, but opposed the dismissal of the third.
[3] Respondent has never filed a brief in this court. At oral argument on June 22, 1987, respondent stated that the brief he had dictated had been erased by mistake from the word processor, and the court granted him an additional two weeks to file a brief. In August, respondent checked out the record from the court, but no brief has ever been received.
[4] The commissioner concluded after a hearing that the other specification (relating to failure to complete the succession) had not been proved (because of an inability of respondent's client and the other heirs to agree on the valuation and disposition of the succession assets), and the Bar Association concurred in that conclusion.
[5] DR 1-102(A) provides the general rules of conduct. DR 9-102 provides specific rules pertaining to client's funds as follows:

"DR 9-102. Preserving Identity of Funds and Property of a Client
"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
"(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
"(B) A lawyer shall:
"(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
"(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."
The Code of Professional Responsibility has been replaced by the Rules of Professional Conduct, effective January 1, 1987. The alleged misconduct, however, occurred before the adoption of the new rules.
[6] Respondent admitted in oral argument that these payments were made in January, 1985, which was the date of the investigatory hearing. Thus, respondent held the client's funds commingled with his own funds from October, 1981 to January, 1985 and did not use the funds to pay succession expenses until he was under pressure from the Bar Association about his failure to complete the succession.
[7] The complaint by Margaret Jones, filed on September 6, 1983, alleged that respondent had failed to conclude the succession within a reasonable time and had only collected $1,400 of the funds withdrawn by Boucree.
[8] DR 2-110(A)(3) provides:

"(A) In general.
"...
"(3) A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned."
[9] After the investigatory hearing the Bar Association decided not to pursue a second specification which had charged respondent with neglecting a legal matter entrusted to him.
[10] In oral argument before this court, respondent returned to his original position that there is no dispute at least $1,000 was unearned.
[11] If the client had discharged respondent the day after employment, respondent could hardly have argued that the client was not entitled to a refund of all of her funds.
[12] Arguably, the attorney should place the disputed portion in the registry of court. At the very minimum, the disputed portion of the funds cannot be withdrawn from the trust account. See DR 9-102(A)(2).
[13] At the commissioner's hearing, respondent testified that he withdrew $14,750, representing the $17,500 deposit minus his statutory fee of $2,750.
[14] The judge pointed out that the fee was $2,700 and not one-third ($5,833), but the note written in the judge's office showed a payment of $4,200 and a promise to pay $7,400, or a total of $11,600, approximately two-thirds of the settlement figure. Respondent testified at one point that Castain wanted to show the two-thirds figure to deceive her brother. At another point respondent testified that they made it appear to be a tort settlement which would constitute the wife's separate property.
[15] Interestingly, the payments through October 13 added up to $11,650, approximately two-thirds of the settlement figure. The receipt for the November 1 payment of $1,400 was noted as "compensation for inconvenience". The final payment of $1,700 in August, 1984, according to both parties, was the balance of the difference between a one-third fee of $5,833 and the statutory fee of $2,750.
[16] Because there was no reference to the August, 1984 payment, the affidavit was evidently prepared before that payment. Indeed, the timing of the final payment, shortly after the letter and affidavit, raises an inference that the payment by respondent was connected with the client's execution of the letter and affidavit that (according to her testimony) had been prepared by respondent.
[17] In the investigatory hearing of June 28, 1985, respondent testified that he told the judge the settlement draft had not cleared. He explained that "it wasn't true, but that's what she wanted me to say. She wanted me to give any excuse for not giving a large sum of money to her in front of her relatives...." (TR 78) He added that Castain demanded her money in full in front of the judge, but called him later and "sort of apologized for not saying anything with her brother there." (TR 79)

At the commissioner's hearing on June 11, 1986, respondent directly contradicted himself by testifying that "I did not participate in this charade" with the judge, adding that her brother did all of the talking. (TR 177) He then solemnly stated that "I was not willing to go to the extent of lying for her". (TR 178)
[18] Perhaps an attorney can keep his client's funds in other than a trust account when his client so requests, but the attorney who wishes to avoid disciplinary problems had better obtain written authority for such conduct.
[19] One of respondent's most persuasive arguments regarding his keeping the funds in cash in his safe was that the cash flow of his practice was not sufficient to allow him to make such payments within a short period if the cash was not in the safe.
[20] Disciplinary Rule 2-106(A) provides:

"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." (emphasis added)
[21] Respondent was also charged with neglecting to pursue the appeal, but he contended that the delay was caused by the parents' failure to produce the funds timely. The commissioner dismissed that specification, and the Bar Association did not object to the dismissal in this court.
[22] Respondent testified that he didn't give Mr. Mitchell the envelope of cash in his desk drawer because it was after office hours and his secretary was not there to issue a receipt.
[23] The deposit slip indicated a $2,300 deposit dated June 1, 1984, consisting of a single check.

Before the $2,300 deposit, there was a negative balance in the account. However, respondent wrote two checks on the account on May 31, 1984, one to Mr. Mitchell for $1,613 and another for $1,100, and these two checks would have exceeded the deposit if the check to Mr. Mitchell had been cashed.
[24] Respondent's argument that these funds were advances for costs which were not required to be kept in a separate account is misplaced. These funds did not fall within the exception to DR 9-102(A) because respondent did not intend to use the funds immediately to pay for costs or expenses, and he was required under those circumstances to keep the funds in a trust account during the period he held them for payment of future costs or expenses.
[25] Respondent claimed he gave the money to Snowden's father because he had trouble contacting Snowden. When asked why he didn't simply write a check on his trust account and mail it to Snowden, he stated he was afraid the settlement check hadn't cleared. Interestingly, he claimed he wrote a check on the trust account in order to give cash to Snowden's father.
[26] While respondent did introduce evidence that he closed the trust account on April 3, 1984 by writing a check to himself in the amount of $3,800 and cashing the check, it would have been a simple matter for respondent to have written a separate check to the client in delivery of the funds and either left the check outstanding or obtained certification of the check at the closing of the account.
[27] Unless there are mitigating factors, disbarment is generally appropriate when a lawyer knowingly converts a client's funds and causes injury to the client. Standards for Imposing Lawyer Sanctions § 4.1 (1986).
[28] There was no evidence of such mitigating factors as absence of prior disciplinary record, remoteness of prior offenses, remorse, absence of dishonest motive, personal or emotional problems, physical or mental disability or impairment, inexperience in the practice of law, or delay in disciplinary proceedings. See Standards for Imposing Lawyer Sanctions § 9:32 (1986).
[29] This evidence was admitted primarily to rebut evidence of neglect in two matters, but both of these specifications were dismissed.