DISCIPLINARY PROCEEDING
HALL, Justice.
The Louisiana State Bar Association instituted this disciplinary proceeding against John W. Porterfield, a Louisiana attorney who is presently under suspension by this Court.[1] There are two specifications of alleged misconduct in this proceeding involving allegations of commingling and misuse of client funds. After reviewing the records of all hearings, pleadings, evidence and arguments, we find that the respondent committed several disciplinary rule violations which warrant his disbarment from the practice of law.
Notice of this disciplinary proceeding was sent by registered mail and received by respondent on June 26, 1989. The Committee on Professional Responsibility held a formal investigative hearing on July 17, 1989. Respondent appeared and was represented by counsel. The Committee, by unanimous vote, found that Porterfield had violated the laws of this state relating to the professional conduct of lawyers and to the practice of law of sufficient gravity as to evidence a lack of moral fitness for the practice of law.
A petition for disciplinary action was filed by the Louisiana State Bar Association to which respondent filed an answer. A Commissioner, John R. Keogh, was appointed and a hearing was held in this matter on January 17, 1990. Porterfield appeared at the hearing and was again represented by counsel. On May 2, 1990, the Commissioner filed his findings with this court with a recommendation that Porterfield be disbarred from the practice of law. The Louisiana State Bar Association concurred with the Commissioner’s findings and recommendation. On Petitioner’s motion, this matter was set for oral argument before this court. Respondent *1037 submitted briefs and appeared at oral argument with counsel.
The Louisiana Bar Association has the burden of establishing by clear and convincing evidence that Porterfield was guilty of the alleged specifications of misconduct. Louisiana State Bar Association v. Dowd, 445 So.2d 723 (La.1984). The two specifications of misconduct will be dealt with separately.
THE PROVOST MATTER
“That in your capacity as Attorney at Law, you were retained by Lester J. Provost and Mary Broussard Provost in a matter involving the wrongful death of their son, David Allen Provost. On or about September 12, 1983, the sum of $300.00 in costs was advanced to you by check written by Mr. Provost. That on or about March 16, 1984, you did receive a check for medical payments from Aet-na Insurance Company in the amount of $2,000.00 payable to the order of the Estate of David Allen Provost and its Attorney, John Porterfield. Said check was not endorsed by either Mr. or Mrs. Provost and was deposited into one of your law firm’s accounts. No funds from this check were disbursed to Mr. and Mrs. Provost. That while some of the proceeds of this check appear to have been either disbursed as expenses or used to reimburse you or your law firm for expenses in this matter, said expenses do not total $2,000.00. That you did on or about January 3, 1985, submit a statement for legal services in this contingency fee matter indicating hourly charges and indicating expenses in an amount of $2,438.30. In truth and in fact, there were no expenses in the amount of $2,438.30 and you are only able to provide canceled checks establishing expenses in the amount of $321.54. That in a letter dated September 8, 1987 to Mr. James Wattigny, you did discuss ■the $2,000.00 medical payment draft from Aetna Insurance Company and in doing so did state: ‘First, the Aetna money was not received by me but was received by Mr. and Mrs. Provost. A check was issued by Aetna payable to the order of Mr. and Mrs. Provost which they endorsed and turned over to my office specifically for payment of costs. Those were the only funds which were ever received from the Provosts either by cash or check.’ That said statement was, in fact, false and misleading. That in truth and in fact, neither Mr. nor Mrs. Provost endorsed the Aetna check. That in truth and in fact, other funds were received by you for costs in this matter. That you have failed, neglected, or refused to properly and accurately account to your client for funds received on your client’s behalf; have, in fact, provided false and misleading accountings; have made false and misleading statements concerning the funds received on your client’s behalf; have failed to keep proper and adequate financial records establishing the expenditures of the funds received on your client’s behalf; and have, in fact, commingled and converted your client’s funds; all of which are in violation of Disciplinary Rules DR 1-102(A)(1)(3)(4)(5)(6), and DR 9-102(A)(B)(1)(3)(4) of the Code of Professional Responsibility of the Louisiana State Bar Association, and Rules 1.15, 4.1(a), and 8.4(a)(c) of the Rules of Professional Conduct of the Louisiana State Bar Association.”[2]
*1038 The Bar Association has established various facts. First, a check from Aetna Insurance Company for $2,000.00, dated March 16, 1984, was made payable to “The Estate of David Allen Provost and its attorney, John Porterfield” and sent to Mr. Porterfield’s post office box in Jeanerette, Louisiana. The cheek was never endorsed by anyone, but bears the stamp, “For Deposit Only — Porterfield & Simmons Client Account 03-7676-0.” The check was deposited on March 22, 1984, into the client account above. Later that day, however, a ■$2,000.00 check on the client account was written payable to “Porterfield & Simmons” and deposited into the firm’s regular operating account, account number 03-7675-2. By Porterfield’s own admission, the $2,000.00 was withdrawn from the client account and deposited into the operating account either on the same day or within a one-day period. In effect, the Aetna check came to rest in the operating account of Porterfield & Simmons after only a brief stay in the client account. A brief sojourn of the funds in Porterfield’s *1039 client account does not alter the fact that these funds were converted into his operating account and used as his own funds.
When an attorney converts client’s funds to his own use and fails to keep them in an identifiable trust account separate from the attorney’s own funds, the burden is placed on the attorney to go forward with evidence to persuade the court there was no conversion of the client’s funds. Louisiana State Bar Association v. Krasnoff, 488 So.2d 1002 (La.1986); Louisiana State Bar Association v. Williams, 512 So.2d 404 (La.1987).
Porterfield presented evidence in the form of canceled checks, receipts, and bill invoices to establish payment of costs and provide an accounting for the $2,000.00 in question. On March 22, 1984, the date the $2,000.00 was transferred from respondent’s client account into his operating account, only two documented payments had been made towards the costs of the Provost Matter: two canceled checks for court costs totaling $251.54. Testimony from both Porterfield and James Wattigny establish that Wattigny was initially retained by the Provosts. Wattigny moved to Florida in 1983, but transferred the file to Porterfield before leaving. Their testimony further establishes that Wattigny incurred costs which were reimbursed by Porterfield. Wattigny testified at both hearings in this disciplinary matter. At the first hearing, he stated that he believed Porterfield reimbursed him for about $500.00 in costs. At the second hearing, Wattigny stated that the amount was only about $300.00. Wattigny stated that he was reimbursed for the following costs: medical payments to Lourdes Hospital, payment to the Louisiana Department of Public Safety, photographs, and long distance calls. The only documented expense, however, is a receipt from the Louisiana Department of Public Safety in the amount of $128.00. We will assume that Wattigny was paid $500.00 in costs.[3] This added to the $251.54 already paid by Porterfield establishes that he had paid only $751.54 in costs at the time he transferred the funds from the Aetna check into his operating account.
Mr. Provost, by check dated July 12, 1983, made a $300.00 advance payment on costs to Mr. Porterfield. This check was cashed by respondent. Since this money represents money advanced to respondent for costs, it must be credited to the costs respondent claims to have paid. Respondent can only claim to have paid $451.54 in out-of-pocket expenses at this point.
Porterfield also established payment of certain costs after the transfer of funds into his operating account which would assist in his accounting for the $2,000.00. There are two checks, each in the amount of $30.00 dollars, which were paid to issue subpoenas. There is a $10.00 check paid to the Secretary of State. Finally, there is a $1.55 receipt for a certified letter. Giving Porterfield the benefit, of the doubt and crediting him with the undocumented $500.00 reimbursement to Wattigny, he has only established payment of $523.09 in costs.[4]
Respondent also presented two bills as evidence of costs. One represents money owed for court reporter services in the amount of $402.15; the second is a bill for $300.00 due for services rendered by a consulting engineer, Dr. Olin Dart. At the Commissioner’s hearing, Porterfield brought an alleged copy of a cashier’s check to establish that the court reporter was paid on or about January 11, 1990.[5] At the July 1989 hearing, Dr. Dart stated that his bill had never been paid. Porter-field was unable to present any record of payment of this bill at either hearing. If respondent is credited with payment of *1040 court reporter costs, the total costs expended by him totals $925.24.
It has been established that Mr. Porter-field removed funds in question from the client account and commingled them with funds in his operating account without knowledge of his clients. Respondent has accounted for only $925.24 in costs expended in the Provost Matter. He has failed to show how he disposed of the balance of the client funds. Respondent testified in the July 17, 1989 hearing that he was attempting to obtain checks from various banks which would account for the remaining costs, but that he would need another 60 to 90 days to do so. At the hearing on January 17, 1990, respondent still claimed to be experiencing difficulty in obtaining records of those checks. Respondent again requested additional time to obtain records of these checks when before this court at oral arguments. Respondent made a final request for additional time to supplement the record in a motion before this court after oral argument. He was granted until October 10, 1990 to submit additional documentation of costs. Despite respondent’s repeated requests to have these proceedings remain open to enable him to supplement the record, nothing has been forthcoming. Respondent has failed to render a prompt accounting, failed to deposit the client’s funds into an identifiable trust account, and failed to timely pay the costs and expenses for which he received the funds. Respondent has violated Disciplinary Rules DR 1-102(A)(1), (3), (4), (5), (6), and DR 9-102(A), (B)(1), (3), (4) of the Code of Professional Responsibility of the Louisiana State Bar Association, and Rules 1.15, 4.1(a) and 8.4(a), (c) of the Rules of Professional Conduct of the Louisiana State Bar Association.
THE SHIPP MATTER
This complaint was lodged by Mr. Lee Herrington, attorney for Sandra Shipp. Mrs. Shipp is the divorced wife of the decedent and mother of the sole heir of the estate in Succession of Kirby Louis Shipp. Respondent was the attorney for the ad-ministratrix of the estate, Beatrice Marie Reech, mother of the decedent and aunt of respondent by marriage. Mrs. Reech testified that she was satisfied with Mr. Porter-field’s handling of the matter and never made any complaints to the Bar Association.
This second specification against Mr. Porterfield stated in pertinent part as follows:
“That in your capacity as attorney as Law, you were the attorney for the ad-ministratrix of the Estate of Kirby Louis Shipp. That in connection with that estate, you were provided funds by check out of the estate.... That decedent left a single heir, a minor child. That the minor child’s mother retained counsel in this succession. That despite demands from said counsel, you have failed, neglected, and refused to provide financial records documenting the payment of the various and sundry costs for which you have received_detailed checks in recompense. That in addition, you have stated that you have paid Federal Income Taxes in the amount of $10,495.04, but have failed, neglected, and refused to provide a copy of the canceled check paying said income taxes. That you have failed, neglected, and refused to provide an accounting as requested by the heir in this succession; have failed, neglected, or refused to comply with proper discovery requests; that you have failed to keep proper financial records relating to the succession funds which came into your possession; and have commingled and converted funds belonging to the succession to your own use; all in violation of Disciplinary Rules DR 1-102(A)(1)(4)(5)(6), and DR 9-102(A)(B) of the Code of Professional Responsibility of the Louisiana State Bar Association, and Rule 1.15, 3.4(d), and 8.4(a)(c)(d) of the Rules of Professional conduct of the Louisiana State Bar Association.”[6]
*1041 The eleven checks in dispute total Thirteen Thousand Nine Hundred Forty-two and 51/100 ($13,942.51) Dollars. The following is a list of those checks:
Check Number Date of Check Payee Amount Purpose Noted on Check
7469 9-30-86 John Porterfield $ 760.00 Credit Thrift
2927 1-8-87 John Porterfield $ 350.00 None
2930 10-3-86 John Porterfield $ 521.70 Credit Thrift
7462 10-9-86 John Porterfield $ 241.86 Court Costs
2924 8-22-86 John Porterfield $4,000.00 Bonnie Carter
Blank 7-11-86 John Porterfield $ 300.00 Bond
07 7-30-86 John Porterfield $2,632.00 Estate Fees
08 9-19-86 John Porterfield $3,100.00 Listed Expenses
2929 1-7-86(87) John Porterfield $ 138.33 Blank
2928 2-9-87 John Porterfield $1,500.00 Taxes — Estate
2926 10-28-86 Cash $ 398.62 LSU-NDSL
Mrs. Reech stated that she signed all of the checks on the estate account, including those payable to Mr. Porterfield. It is alleged that respondent converted the checks above and commingled these funds with his own. A review of the check copies itemized above reveals that all but two of the checks above were merely endorsed by Porterfield and not deposited into any client or trust account.[7] Mr. Porterfield testified that these checks were written to him in order to reimburse him for expenses he had already paid on behalf of the estate. He testified that these checks were transferred from the estate account and deposited into his operating account, thus confirming that these funds were converted to respondent’s own use. These facts and respondent’s own admission establish that he failed to keep the disputed funds in an identifiable trust account. Respondent again has the burden of presenting evidence to prove that no conversion of client funds took place. LSBA v. Krasnoff, supra.
Respondent contends that the check for $760.00 was reimbursement for a payment he had made to Credit Thrift on behalf of the estate. Credit Thrift held a mortgage on a boat which was owned by decedent at the time of his death. A letter from the manager of Credit Thrift shows that two checks were received in payment of this estate debt. The first was in the amount of $1,565.10, and dated' July 30, 1986. There is a check in the record issued by the administratrix directly to Credit Thrift. *1042 The second is in the amount of $521.70, with payment recorded on October 15, 1986. The balance of $29,207.86 was paid after the boat was sold. There is no record, nor does respondent present any documentation to indicate that he paid $760.00 to Credit Thrift. This letter does, however, indicate that respondent might have been entitled to reimbursement for the $521.70 payment to Credit Thrift. Respondent claims that he received the $1,500.00 check to reimburse him for taxes he paid on behalf of the estate. He has failed to produce any proof of such a payment. Respondent has also failed to document the purpose of the $350.00 check, although the check was payable to and endorsed by him.
The check for $3,100.00 notes “listed expenses” on its face. Respondent testified that this check was “a check issued to the Louisiana Department of Revenue and Taxation.” [8] It is obvious that this check was made payable to respondent, not the Department. He further claims that this check was returned and the money was placed back into the estate. Respondent claims that the estate bank records produced did not go far enough forward by date to show where he reimbursed that money to the estate. There is nothing in the record to show this. money was ever returned to the estate.
A portion of the $2,632.00 check and the $300.00 check are accounted for. Respondent contends that $132.00 of the $2,632.00 check and the $300.00 check were paid to reimburse him for a bill from Western Surety for a bond in the amount of $432.00. Respondent claims that the $2,500.00 balance of the $2,632.00 check was retained for his fee. It should be noted that the trial court in “The Succession of Kirby Louis Shipp” had not given final approval to the payment of attorney’s fees because the final accounting was objected to. Although respondent was not entitled to these funds, for the purposes of these proceedings we will find that respondent did not convert them.
Respondent was questioned about the $138.33 check at the hearing before the committee, but was unable to account for that check. He was not questioned on this check at the Commissioner’s hearing, however. Respondent claimed that the $241.86 check was received to reimburse him for court costs. Apparently, court costs were paid in this matter in excess of $241.86; therefore, for the purposes of this proceeding, it will be assumed that respondent has accounted for these two checks.
There was a check in the record for $398.62 payable to L.S.U.-NDSL from the estate account dated May 8,1986. There is no evidence, however, that L.S.U.-NDSL actually received the funds from this check. On October 28, 1986, a check payable to cash was written on the estate account for $398.62. Respondent claims that this check was reimbursement for a payment he had previously made to L.S.U.-NDSL. Again respondent fails to document or present any evidence to show that he actually made any payment to L.S.U.-NDSL from his personal funds for which he should be reimbursed.
Finally, the record establishes that respondent endorsed a check for $4,000.00 written from the estate account. The notation on the check indicates that the check was written to reimburse Bonnie Carter. Although the testimony surrounding this check is confusing, it was established that these funds were not used to reimburse Bonnie Carter. A subsequent check was written from the estate account directly to Mrs. Carter for the $4,000.00 owed to her by the estate. Respondent testified that he used the $4,000.00 check he endorsed to pay taxes on the estate. Respondent does not have any documentation on the payment of taxes.
It has been established that respondent endorsed checks from the estate and commingled these funds with his own without proper documentation. The checks found to have been converted by respondent are those in the following amounts: $760.00, $350.00, $4,000.00, $3,100.00, $1,500.00, and *1043 $398.62. Respondent has converted and commingled $10,108.62 in client funds.
Respondent has failed to present any evidence which would rebut this finding, despite two hearings, a lengthy interim period and arguments presented to this court. Since the first hearing on July 17, 1989, Porterfield has claimed that records were being sought and would be forthcoming. He requested the Commissioner to hold the record open as of the day of the hearing so his secretary could submit bank documents on the day of the hearing. The record was held open for an additional thirty days to allow respondent to supplement the record, yet he failed to do so. In argument to this court, respondent requested additional time to submit documents on his behalf. He also filed a motion for an extension of time and was granted until October 10, 1990 to supplement the record before this court. He has repeatedly failed to take advantage of these opportunities to supplement his defense to the point it appears that these are merely dilatory tactics on his part.
At both hearings in this matter, respondent claimed that on behalf of the estate he paid the I.R.S. $10,495.04 in taxes from his personal account. This would account for or offset the money converted, but respondent has failed to produce any evidence of any payment to the I.R.S. At his first hearing, he claimed that he sent the I.R.S. a check for about $10,000.00 in April of 1987. At the second hearing before the Commissioner, respondent claimed that these taxes were paid in two checks. The explanation for his failure to produce evidence of payment of these taxes is incredible. He first contends that the reproduction of the bank documents in question would cost him between $2,500.00 and $5,000.00. The committee subpoenaed various bank records prior to the first hearing and attached to those records were bills. Sunburst Bank charged $72.00 for research, retrieval, and reproduction of documents. Louisiana National Bank charged $23.80 for research, copies, and Federal Express charges for transmittal of the bank records. Respondent’s other excuse for failure to produce any records was the loss of a computer disk through theft. Respondent claims that all of the pertinent financial information in this matter was lost when this computer disk was stolen. It is peculiar that the computer which contained the disk was left undisturbed in the theft. It is also incredible that there were no back-up disks or other documentary evidence in possession to confirm these transactions.
In light of these facts, we find that respondent has failed to render a proper accounting of the succession funds; failed to keep proper financial records relating to the succession funds which came into his possession; and has commingled and converted funds belonging to the succession to his own use. All of these acts are in violation of Disciplinary Rules DR 1-102(A)(1), (4), (5), (6), and DR 9-102(A), (B) of the Code of Professional Responsibility of the Louisiana State Bar Association, and Rules 1.15 and 8.4(a), (c) and (d) of the Rules of Professional Conduct of the Louisiana State Bar Association.
Based on the established violations, the incredible testimony of Mr. Porterfield, coupled with his disregard of the seriousness of this matter, and the aggravating factor of respondent’s prior disciplinary proceedings, it is ordered that John W. Porterfield be disbarred from the practice of law.

DECREE

It is ordered that the name of John W. Porterfield be stricken from the roll of attorneys and that his license to practice law be canceled, effective upon the finality of this decision. All costs of the proceedings are assessed to respondent.

. Respondent was suspended from the practice of law for three years in Louisiana State Bar Association v. Porterfield, 550 So.2d 584 (La.1989).

. "DR 1-102 Misconduct.
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6)Engage in any other conduct that adversely reflects on his fitness to practice law.”
"DR 9-102 Preserving Identity of Funds and Property of a Client.
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
*1038 (1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.”
"Rule 1.15 Safekeeping property
(a) A lawyer shall hold property of clients or third persons that is in a lawyer’s possession in connection with a representation separate from the lawyer’s own property. Funds shall be kept in a separate account maintained in a bank or similar institution in the state where the lawyer’s office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c)When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.”
“Rule 4.1 Truthfulness in statements to others
In the course of representing a client a lawyer shall not knowingly:
(a) Make a false statement of material fact or law to a third person; or
(b) Fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.”
"Rule 8.4 Misconduct.
It is professional misconduct for a lawyer to:
(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) Commit a criminal act especially one that reflects adversely on the lawyer’s honesty, trustworthiness or fitness as a lawyer in other respects;
(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) Engage in conduct that is prejudicial to the administration of justice;
(e) State or imply an ability to influence improperly a judge, judicial officer, governmental agency or official;
(f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law; or
(g) Except upon the expressed assertion of a constitutional privilege, to fail to cooperate with the Committee on Professional Responsibility in its investigation of alleged misconduct.
(h) Present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter.”

. At the July 17, 1989 hearing, respondent claims to have paid Wattigny $315.00 for costs advanced.

. Respondent has documented evidence of only $451.09 in costs. The Commissioner found documented evidence of $449.54 in costs, but he did not take into account the receipt for the certified letter.

.In the hearing on July 17, 1989, Porterfield testified that the bill for the court reporter had been paid.

. “Rule 3.4 Fairness to opposing party and counsel
A lawyer shall not:
(a) Unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material hav *1041 ing potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;
(b) Falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;
(c) Knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;
(d) In pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party;
(e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; or
(f)Request a person other than a client to refrain from voluntarily giving relevant information to another party unless:
(1) The person is a relative or an employee or other agent of a client, and
(2) The lawyer reasonably believes that the person’s interests will not be adversely affected by refraining from giving such information.”

. Only check number 2930 for 1521.70 has a notation indicating a deposit into an account, however, it was never established that this account was a client or trust account.

. Transcript of Commissioner's Hearing, January 17, 1990, p. 167.