576 So.2d 504 (1991)
LOUISIANA STATE BAR ASSOCIATION
v.
Remy F. GROSS, II.
Nos. 88-B-1818, 88-B-1819.
Supreme Court of Louisiana.
March 11, 1991.
*505 Thomas O. Collins, Executive Counsel, Cheri A. Cotogno, Asst. Counsel, Fred Ours, for plaintiff-applicant Louisiana State Bar.
Remy F. Gross, II, pro se.
William A. Porteous, III, Porteous, Hainkel, Johnson & Sarpy, for defendant-respondent Remy Gross.
HALL, Justice.
The Louisiana State Bar Association, through its Committee on Professional Responsibility, instituted disciplinary proceedings against respondent, Remy F. Gross II, arising out of two separate complaints, one of which will be referred to as the Alexander Succession matter and the other as the Ovalasiti matter.
In regard to the Alexander Succession matter, notice of the first specification of misconduct was sent to Gross on July 23, 1987, and a hearing was held on August 13, 1987. Respondent appeared but was not represented by counsel. Notice of a second specification of misconduct was sent to respondent on February 11, 1988, and a hearing was held on March 8, 1988, at which respondent was represented by counsel. In regard to the Ovalasiti matter, a specification of misconduct was sent to respondent on January 8, 1988, and a hearing was held on March 8, 1988, at which respondent was represented by counsel. The Committee was of the opinion that respondent was guilty of misconduct as set forth in each specification.
The Committee filed two Petitions for Disciplinary Action on July 12, 1988, under Numbers 88-B-1818 and 88-B-1819. A commissioner, Brod Bagert, was appointed and a commissioner's hearing was held on March 1, 1989. On October 1, 1990, the commissioner filed his reports, finding that respondent was free of any professional wrongdoing in both matters. The Disciplinary Board, successor to the Committee, opposed the commissioner's findings and these matters were consolidated and set for oral argument before this court. Respondent submitted briefs and was represented by counsel at oral arguments.
The Louisiana Bar Association has the burden of establishing by clear and convincing evidence that respondent was guilty of the alleged specifications of misconduct. Louisiana State Bar Association v. Dowd, 445 So.2d 723 (La. 1984). The two complaints will be discussed separately.

THE ALEXANDER SUCCESSION MATTER
The following specifications of misconduct were made:
"That you were retained originally by Foster Cambre, in connection with his claim to land belonging to his deceased uncle, Camille Alexander. Said land was purchased by Camille Alexander between his first and second marriage and devolved to Camille Alexander's second wife, and then to other parties. Your uncle, Foster Cambre, contended that the property in question was the separate property of his uncle, Camille Alexander. Thereafter, you were retained by approximately 11 of 26 heirs claiming ownership of said property. You undertook to represent the group of heirs on an hourly basis to be paid from the proceeds from *506 any litigation. The litigation resulted in the 26 heirs receiving one half interest in the property [in] indivision with two defendants. The two defendants purchased one parcel and agreed to list the other parcel of the sale. The sale of said parcel was on June 22, 1984, and yielded $50,000.00 in sales proceeds which you retained as part of your fee. Your [sic] charged the heirs which you represented $52,445.19, leaving a balance owed to you in the amount of $2,445.19 after said sale. The Committee is of the opinion that the above and foregoing conduct is in violation of Disciplinary Rules 1-102 and 2-106(A) and (B) of the Code of Professional Responsibility of the Louisiana State Bar Association.[1]
"That you failed, refused and neglected to advise the heirs of the receipt of $50,000.00 and failed, refused and neglected to furnish an accounting to the heirs upon receipt of the $50,000.00 sales proceeds. That you commingled and converted $50,000.00 to your own use as evidenced by your receipt of the sum of $50,000.00, your refusal to furnish an accounting to the heirs upon receipt of said funds and your failure to place the sum of $50,000.00 in a trust account upon receipt of same. The Committee is of the opinion that the above and foregoing conduct is in violation of Disciplinary Rule 1-102 and Disciplinary Rule 9-102(B)(3) of the Code of Professional Responsibility of the Louisiana State Bar Association."[2]
The record establishes that in April of 1979, Foster Cambre contacted Gross concerning the Alexander Succession matter. Cambre believed that he and several other individuals were entitled to an interest in certain parcels of land involved in the Succession of Camille Alexander. Alexander acquired a one-half interest in the property in dispute between his first and second marriages. The property was purchased between 1902 and 1904. Later, after his marriage to his second wife, Arcise Jacob, he acquired the remaining one-half interest in the disputed property. Only this onehalf interest was community property. Alexander died intestate on May 10, 1961. He was survived by his wife. Alexander had no ascendants or descendants. On January 6, 1964, his wife died testate, leaving all of her property to Mr. and Mrs. Lawrence J. Keating. The successions of Mr. and Mrs. Alexander were combined and settled in one proceeding. The judgment of possession that resulted was rendered May 28, 1964. Cambre, a collateral heir, sought to be recognized as a legal heir of Camille Alexander with a property interest in the separate property that Mr. Alexander purchased prior to his marriage to Arcise Jacob.
Respondent researched and verified Cambre's claim. It was determined that there were as many as 27 Alexander heirs with a potential claim to the succession property. Gross met with Cambre and several other heirs in September 1979, and agreed to accept the case on an hourly fee basis at his prevailing rate which was then $50.00 per hour, with a $5,000.00 retainer in advance.[3] Cambre agreed to contact all of the potential heirs in an effort to collect the retainer. Only $3,500.00 of the retainer fee was collected, with several heirs indicating that they did not wish to participate in the proceedings.
After accepting the case, Gross assigned Tony Tillman, an attorney employed by respondent, the task of researching and preparing the case. Tillman described some of the efforts he made to this end. He was required to conduct title searches to determine what property was owned by Alexander and the disposition of that property from 1902 to the present. There were issues of prescription and the question of the proportional interest of each heir in the disputed property. Tillman estimated that he spent 452 hours on this case, but believed this to be a conservative estimate.
*507 John L. Diasselliss III was also assigned to work on this case. He also stated that his estimate of 34 hours was a conservative estimate. Gross estimated his own time at 160 hours.
The litigation of this matter was extensive and complicated. During about five years of litigation, the succession proceeding progressed to the appellate level twice and had writs denied by this court once. See Keating v. Cambre, 407 So.2d 787 (La. App. 4th Cir.1981); Keating v. Cambre, 446 So.2d 326 (La.App. 5th Cir.), writ denied 446 So.2d 1222 (La.1984). At the conclusion of these proceedings, Gross prevailed and the 26 heirs were declared owners of a one-half interest in the disputed property. Keating, supra at 329.
The land was appraised as follows: Parcel one was valued at either $33,600.00 or $15,000.00 (the lower value being due to a lease on the property which ran through July of 1993); Parcel two was valued at $25,000.00; Parcel three was valued at $15,500.00; and Parcel four was valued at $85,000.00. The clients' half interest in parcels one and four were sold for $50,000.00.[4] The sale was funded by two $25,000.00 cashier's checks dated June 18 and June 20, 1984. These checks were endorsed to Gross as attorney for the heirs of Camille Alexander, pursuant to a provision in the act of sale signed by all heirs authorizing payment of the sale proceeds to Gross. The proceeds were not placed in a trust account and were deposited in respondent's operating account as payment of his fee. Gross had not kept contemporaneous time records, but reviewed his files, talked to Tillman, and decided the fee he had earned was at least $50,000.00. According to Gross, he discussed the fee with Foster Cambre, who approved the amount.
Almost two years later, by letter dated February 19, 1986, eight of the heirs demanded payment of any money held by respondent. On April 17, 1986, respondent mailed a statement to the heirs, which billed $56,000.00 in attorney's fees. The proceeds from the sale and the $3,500.00 retainer were deducted from this amount, leaving a balance of $2,500.00 owed by the heirs. Several of the heirs filed a complaint with the Bar Association. Gross prepared a more detailed statement after receiving a letter from the Committee. He admits that contemporary time sheets were never kept and that the bill was devised from memory. Respondent's reconstruction of the time spent by him and his associates totals over 640 hours. His regular hourly rate increased over the years during which the litigation continued. The fee charged would calculate out at about $83.00 per hour for the hours shown.
Respondent is accused of charging a clearly excessive fee and commingling and converting his clients' funds. We will first consider the allegation concerning excessive fees. The issue is whether, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee charged by Gross is in excess of a reasonable fee. To determine this, various factors must be considered. See DR 2-106, Louisiana Code of Professional Responsibility. The facts indicate that Gross was entitled to a substantial legal fee for his work in this matter. The legal questions involved were novel and complicated, and the title research was complicated and time-consuming. A high degree of skill was required and demonstrated by Gross and his associates. Gross was both diligent and competent in his representation, although the prospect of a favorable outcome was doubtful. He prevailed after protracted and exacting litigation, obtaining an interest of over $70,000.00 for his clients. This court also takes notice of the peculiar fee arrangement in this case. Although the parties entered into an hourly fee agreement, only $3,500.00 of the $5,000.00 retainer fee was paid to respondent. It is evident that no further fee would have been paid by the clients except out of recovered assets. The payment of fees in this case was clearly contingent upon a successful resolution of the case. Respondent faced the considerable risk of receiving only $3,500.00 for the exhaustive legal services provided to his *508 clients. This risk is magnified by respondent's belief that it was doubtful his clients would prevail in this litigation. Based upon the combination of these facts, we find that although the fee charged was substantial and perhaps not fully documented, it was not "clearly" excessive as defined in the Disciplinary Rule. The violation of DR 2-106 was not established by clear and convincing evidence.
When it is established that an attorney fails to keep his client's funds in an identifiable trust account separate from the attorney's own funds, the burden is placed on the attorney to show that there was no conversion of the client's funds. Louisiana State Bar Association v. Williams, 512 So.2d 404 (La.1987). Gross admitted that the proceeds in question were never deposited into a trust account. He candidly acknowledged that he took the entire $50,000.00 as a fee. Respondent claims that he had earned the fees and, therefore, no conversion took place. He also claims that Foster Cambre, who was the leading representative of the client group approved the amount of the fee. Although this argument has some merit, it does not relieve him of his duties under DR 9-102(A)(2) of the Rules of Professional Responsibility. This rule provides that funds belonging in part to a client and in part to the lawyer or law firm must be deposited into a trust account, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved. Although respondent may have been entitled to a fee equal to the sale proceeds, he had a duty to place the proceeds in a trust account and notify all clients of his intention to retain the funds as a fee. Respondent failed to do this initially. Once he became aware that his clients disputed his entitlement to the full $50,000.00 in fees, respondent had the duty to place any disputed amount in a trust fund until the dispute was finally resolved. We find that respondent violated DR 9-102(A)(2).

THE OVALASITI MATTER
The following specification of misconduct was made:
"That you were retained as an attorney by Gloria Ovalasiti in approximately late March or April of 1985 to execute a power of attorney from her aunt, Josephine O. Berthiaume who was in Green Briar Nursing Home in Slidell, Louisiana and later to handle the Succession of Josephine O. Berthiaume. In connection therewith, you executed a power of attorney dated April 2, 1985 appointing Gloria Ovalasiti to handle the affairs of her aunt, Josephine O. Berthiaume. Shortly thereafter, in approximately April of 1985, Gloria Ovalasiti withdrew the sum of $7,610.20 from Josephine O. Berthiaume's account at Southern Savings Association, account number XXXXXXXXXX and furnished this sum to you to pay for expenses for caring for Josephine O. Berthiaume and for any funeral expenses in the event that Josephine O. Berthiaume died, which did occur on August 29, 1985 in the United Medical Center. You failed, refused, and neglected to hold the sum of $7,610.20 in trust and have advised that this sum was furnished to Inter-Cities Petroleum Corporation, a corporation which you have been president since 1984 and which is owned 2/3 by your father and the remainder by your son. You failed, refused, and neglected to use this money to properly care for Josephine O. Berthiaume. In March of 1986, you advised Gloria Ovalasiti that the funeral bill of Josephine O. Berthiaume at McMahon Coburn Briede Funeral Home in the amount of $2,586.49 was paid. Said bill was not paid by you until approximately April 25, 1986, at which time McMahon Coburn Briede was ready to file suit against Gloria Ovalasiti. Shortly after the power of attorney was executed on April 2, 1985, Josephine O. Berthiaume moved into the home of Gloria Ovalasiti. You visited Josephine O. Berthiaume and Gloria Ovalasiti at the home of Gloria Ovalasiti inquiring as to whether Josephine O. Berthiaume desired to execute a will. On April 15, *509 1985, Josephine O. Berthiaume executed a will appointing Gloria Ovalasiti executrix of her estate and appointing you as attorney and notary of her estate. On April 15, 1985, there was a cash sale transaction whereby Inter-Cities Petroleum took title to property owned by Josephine O. Berthiaume located at 2316 and 2318 North Prieur Street, New Orleans, Louisiana for the sum of $45,000.00. Said cash sale bears the signature of Josephine O. Berthiaume. Josephine Berthiaume died on August 29, 1985. On October 18, 1985, Inter-Cities sold the property located at 2316 and 2318 to Shelter Investments. Said property was sold without the knowledge and authority of Gloria Ovalasiti. Further, you obtained the signature of Gloria Ovalasiti on a communication dated April 26, 1985 which authorizes Inter-Cities Petroleum to take title to the property located 2316 and 2318 North Prieur, to borrow against said property and to sell said property, knowing that Gloria Ovalasiti did not read the contents of said communication. You failed, refused and neglected to reveal the contents of the communication of April 26, 1985 to Gloria Ovalasiti. You further failed, refused and neglected to hold the proceeds of the sale of property located at 2316 and 2318 North Prieur in trust and failed to remit said proceeds to the rightful owner. Said proceeds from sale were furnished to Inter-Cities Petroleum Corporation. Your client, Gloria Ovalasiti obtained the services of Frank Larre' in early 1986 and then John E. Jackson in an effort to obtain an accounting and information regarding transactions on behalf of Gloria Ovalasiti. You failed, refused and neglected to furnish an accounting or information regarding transaction on behalf of Gloria Ovalasiti. To date, Gloria Ovalasiti is not in possession of funds owed to her. On April 10, 1986, a promissory note was executed, made payable to Gloria Ovalasiti in the amount of $16,126.67 signed by you as president of Inter-Cities Petroleum Corporation. The Committee is of the opinion that the above and foregoing conduct is in violation of Disciplinary Rule 1-102, Disciplinary Rule 5-104(A), Disciplinary Rule 6-101(A)(3) and Disciplinary Rule 9-102(B)(3) of the Code of Professional Responsibility and Rule 1.15 of the Rules of Professional Conduct.
"It is further alleged that you commingled and converted said funds to your own use, as evidenced by your receipt of said funds and your failure to furnish said funds to the rightful owner in violation of Disciplinary Rule 1-102 and Disciplinary Rule 9-102(A)(B).
"You further failed, refused and neglected to complete the succession matter and charged Gloria Ovalasiti legal fees of $8,120.34 in violation of Disciplinary Rule 1-102, Disciplinary Rule 2-106(A)(B) and Disciplinary Rule 6-101(A)(3) and Rule 8.4, Rule 1.1, Rule 1.3, Rule 1.4 of the Rules of Professional Conduct."[5]
The evidence adduced at the hearings establishes the following facts. Mrs. Ovalasiti hired respondent to draft a document granting her power of attorney from her aunt, Mrs. Berthiaume, who was in a nursing home. The power of attorney was signed on April 2, 1985. Mrs. Ovalasiti then withdrew $7,610.20 from Mrs. Berthiaume's savings account and gave it to respondent. Mrs. Ovalasiti was very concerned about having funds or property under her control that might affect her entitlement to social security or medicare. On April 15, 1985, a will was executed bequeathing Mrs. Berthiaume's entire estate to Mrs. Ovalasiti. Two other documents were drafted by respondent and executed contemporaneously with the will. The first was a cash sale transferring property owned by Mrs. Berthiaume and located at 2316 and 2318 N. Prieur Street to Inter-Cities Petroleum Corporation (Inter-Cities) for the stated consideration of $45,000.00. Gross was the president of Inter-Cities, a corporation owned by respondent's father and respondent's minor son in twothirds and one-third shares, respectively. The second document executed was a counter *510 letter which stated that, in fact, Inter-Cities had no interest in the property and that the property was taken for the sole account of Mrs. Gloria Ovalasiti. In that document, both Mrs. Ovalasiti and Mrs. Berthiaume acknowledged that the transfer of title was an outright gift to Mrs. Ovalasiti for no monetary consideration. The $7,610.20 which was withdrawn from the savings account was also paid to Inter-Cities to be held for Mrs. Ovalasiti's account and to be used to pay Mrs. Berthiaume's expenses.
On April 26, 1985, respondent prepared a letter addressed to Mrs. Ovalasiti which stated, in pertinent part:
"In accord with our many discussions and your request, Inter-Cities Petroleum Corporation has taken title to this property on your behalf and as your nominee. The object of this transaction was to avoid your receipt of property or funds which would interfere with your medicare and medicaid benefits. Moreover, since your aunt is low on funds and there is the immanent [sic] prospect of your needing more funds to take care of her requirements, you have authorized Inter-Cities to borrow against this property for the purpose of raising additional funds to be used for the needs of Mrs. Berthiaume until the property can be sold by Inter-Cities, which sale you have also urged and authorized at the price, terms and conditions Inter-Cities, in its sole discretion deems fitting and proper. In addition, you have authorized me to deduct all legal fees accruing to my representation of you in connection with your hadling [sic] of Mrs. Berthiaume and her affairs.
"In consideration of the foregoing and in pursuant to your further requirements, upon Mrs. Berthiaume's death, any funds remaining with Inter-Cities for your account will be disbursed to you on your request in amounts not to exceed $200.00 monthly, or as otherwise agreed."
Mrs. Ovalasiti signed the document and acknowledged her signature at the hearing. Although she claims that she did not read the document before signing it, testimony by Delton J. Arceneaux, Ronald Hogan, and respondent establish that the document was read to her before she signed it.
Mrs. Berthiaume died in August 1985. Disbursements were made both before and after her death for expenses related to Mrs. Berthiaume's care and funeral. Disbursements totaled $13,363.19, with $6,160.00 of that amount disbursed directly to Mrs. Ovalasiti.
The property was sold by Inter-Cities to Shelter Investments, Inc. for $30,000.00 on October 18, 1985, with the proceeds being deposited into the Inter-Cities corporate account. After Mrs. Berthiaume's death, Mrs. Ovalasiti was extremely distressed; at times she wanted to receive the money being held for her in cash and at other times she wanted monthly payments as originally contemplated. She became dissatisfied with respondent and retained an attorney in an attempt to obtain the proceeds from the sale of property. In a letter from the law offices of Frank Larre, dated April 17, 1986, she demanded the return of all funds remaining in the Inter-Cities corporate account. Respondent sent Larre several documents, including a promissory note executed by him as president of Inter-Cities, dated April 10, 1986, in the amount of $16,126.67, with 13.5 percent interest, payable to Mrs. Ovalasiti in 60 monthly installments of $372.55, beginning May 10, 1986. Respondent submitted an accounting of how the principal amount of $16,126.67 was calculated. Total receipts were $37,610.20. Disbursements were $13,363.19. Also deducted was an attorney fee of $8,120.34, leaving the balance of $16,126.67.
Respondent issued several installment payments to Mrs. Ovalasiti, but she refused to accept them. She insisted upon the return of the title to the property sold by Inter-Cities. She also objected to the attorney's fees charged by respondent, alleging that they were excessive. Respondent contends that the proceeds from the sale of the disputed property remain in the Inter-Cities corporate account, and that he has offered to pay Mrs. Ovalasiti the principal *511 balance due, but she has refused to accept it.
It is evident from the foregoing findings of fact that respondent did not convert the funds in question. Respondent presented ample evidence to establish that over $13,000.00 in expenses and advances were paid on behalf of Mrs. Berthiaume and Mrs. Ovalasiti. This refutes the claim that respondent converted the $7,610.20 furnished to him from Mrs. Berthiaume's savings account. Documentation provided by respondent also establishes that the placement of the sale proceeds into the corporate account was pursuant to his client's instructions. A financial statement furnished to the Committee shows the corporation is solvent and is able to pay Mrs. Ovalasiti the money held for her account. This being the case, there can be no conversion.
It is also urged that respondent violated the rules of Professional Responsibility by entering into a business transaction with his client. DR 5-104(A) provides that a lawyer shall not:
(1) enter into a business transaction with a client
(2) if they have differing interests therein and
(3) if the client expects the lawyer to exercise his professional judgment therein for the protection of the client,
(4) unless the client has consented after full exclosure.
Louisiana State Bar Association v. Bosworth, 481 So.2d 567, 571 (La.1986).
When a lawyer enters into a business transaction with his client where they have differing interests and when the client expects the lawyer to exercise his professional judgment in that transaction for the protection of the client, the lawyer should at least advise the client to seek outside counsel. If the advice to seek outside counsel has not been given, or though given, has not been taken, then full disclosure would require the type of advice which a prudent lawyer would be expected to give the client if the client consulted the lawyer regarding such a transaction with a third person. Bosworth, at p. 572. In Bosworth, this court found that the respondent failed to provide a full disclosure to his client because he did not furnish her with a financial statement; did not provide or offer to provide collateral to secure the loan; and did not disclose his true financial situation.
Although Gross did not have an ownership interest in Inter-Cities, he engaged in a business transaction with Mrs. Ovalasiti when acting as the president of that corporation, owned by his family members. By placing the proceeds of the sale of property into the corporate account, Gross was acting as both corporate president and as counsel for Mrs. Ovalasiti. Gross, himself, classified the dealings as a business transaction. Inter-Cities has benefited from the use of Mrs. Ovalasiti's $30,000.00. It is Inter-Cities' best interest to pay her in 60 installments, thereby maximizing the benefits of the use of the funds in the corporate account. This is directly the opposite of Mrs. Ovalasiti's best interest, which she decided is the immediate payment of all funds due to her. She was not provided with a financial statement for Inter-Cities until after this complaint was filed. No collateral was provided or offered to secure and protect Mrs. Ovalasiti's interests. Respondent is in violation of DR 5-104(A).
Finally, the question of clearly excessive fees will be addressed. The issue is whether a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee of $8,120.34 charged by respondent was excessive. Respondent informed Mrs. Ovalasiti that he would charge her his normal hourly rates. He admitted that he never told her what his normal hourly rate was. He also stated that he never intended to charge her a full fee for all of the extensive time he spent talking to her on the telephone, until she became antagonistic and abusive.
The fee charged by respondent in his accounting is clearly excessive. Respondent drafted and assisted in the execution of four documents while in the sole employment of Mrs. Ovalasiti: The power of attorney, the sale document, the counter letter, and the will. None of these documents *512 were especially complex or required any particular legal skill in drafting. The charges for preparation of these documents, conferences and travel expenses total $2,250.00. Respondent also charged Mrs. Ovalasiti over $5,000.00 in attorney's fees for telephone conversations. Although at first appearance the numbers and length of the telephone conversations appear unlikely, a contemporaneous record of the conversations, subject matter, and length was kept in respondent's office. Mr. Larre verified Mrs. Ovalasiti's tendency to call several times a day and to engage in lengthy conversations while he was representing her. However, Mrs. Ovalasiti was clearly unaware that she would be charged for these conversations. Respondent did not clearly inform her that she would be charged for these conversations and never informed her of the rate at which she would be charged. Judging from the documentation of the services he rendered on his client's behalf, respondent should not have charged more than $2,000.00 in attorney's fees. Anything above that amount is clearly excessive, especially in light of the fact that he was operating under a conflict of interest as the president of Inter-Cities. Given this conflict of interest, it follows that the quality of services provided Mrs. Ovalasiti was necessarily lacking. Respondent was in violation of DR 2-106 of the Rules of Professional Responsibility and Rule 1.5 of the Rules of Professional Conduct.
Other violations specified in regard to the Ovalasiti matter were not established and do not require discussion.

DISCIPLINE
The purpose of lawyer disciplinary proceedings is not to primarily punish the lawyer, but to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession and to deter other lawyers from engaging in ethical violations. The discipline imposed will depend upon the seriousness of the offense involved and the facts and circumstances of each case. The court will take into consideration both aggravating and mitigating circumstances. Louisiana State Bar Association v. Bosworth, 481 So.2d 567 (La.1986); Louisiana State Bar Association v. Hickman, 471 So.2d 696 (La.1985); Louisiana State Bar Association v. Whittington, 459 So.2d 520 (La.1984).
With respect to respondent's failure to place the sale proceeds into a trust account in the Alexander Succession matter, we find certain mitigating circumstances. Respondent believed, in good faith, that he was entitled to a fee equal to the amount of the proceeds. He had the approval of the main representative of the clients. There is no evidence of malice, deceit or misrepresentation involved in this violation. Finally, since respondent was entitled to a substantial fee at least approaching if not equal to the amount of the funds, there was no significant harm to the clients. The aggravating factor in this matter is respondent's failure to provide his clients with a statement of fees until months after he retained the $50,000.00 in fees.
In the Ovalasiti matter, respondent is found to have engaged in a business transaction with his client without full disclosure and to have charged his client an excessive fee. As a mitigating factor for the first violation, respondent originally had Mrs. Ovalasiti's best interest in mind when he suggested that Inter-Cities hold her property to allay her concerns about losing social security and medical benefits. The evidence does not establish deceit or misrepresentation. The transactions involved in this matter were acknowledged and originally approved by respondent's client. Respondent's greatest transgression in this violation was his failure to recognize the conflict of interest and his failure to inform his client of such a possibility.
With respect to the excessive fees, respondent again did not act with intent to deceive or defraud his client. It is clear that respondent did spend a considerable amount of time planning, preparing and having executed the original documents, and on the telephone with his client or on his client's behalf. However, based on the quantity and quality of services provided to *513 Mrs. Ovalasiti, the nature and value of the subject matter, and the failure to have a clear understanding with the client about the fee to be charged, the fees were clearly excessive.
We conclude that a public reprimand is the appropriate disciplinary action in these matters, assuming that respondent will promptly cause Inter-Cities to pay Mrs. Ovalasiti the money held by the corporation for her account after deducting a reasonable attorney fee due respondent of $2,000.00. The amount due her is $22,247.01, with interest at the rate of 13.5 percent, as provided in the promissory note, from the date the sale proceeds were received, October 18, 1985. Payment should be made on or before 60 days from the date this judgment becomes final. Proof of payment shall be furnished to the Disciplinary Board. Should respondent fail to furnish proof of payment within that time period, he shall be suspended from the practice of law until such time as he furnishes proof to the Board that such payments have been made.

DECREE
For the reasons assigned, it is ordered, adjudged and decreed that Remy F. Gross II be and he is hereby publicly reprimanded for his conduct in these matters. Respondent is further ordered to cause Inter-Cities to pay Mrs. Ovalasiti $22,247.01, plus 13.5 percent interest from October 18, 1985, on or before 60 days from the date this judgment becomes final and to furnish proof of said payment to the Disciplinary Board. Upon failure to provide proof of these payments within the time limit, Remy F. Gross II shall be suspended from the practice of law until such time as he furnishes proof to the Board that said payments have been made. Respondent is to bear all costs of these proceedings.

APPENDIX
1 "DR 1-102 Misconduct.
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law."
"DR 2-106 Fees for Legal Services.
(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent."
2"DR 9-102 Preserving Identity of Funds and Property of a Client.
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging *514 to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."
5 "DR 5-104 Limiting Business Relations With a Client.
(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."
"DR 6-101 Failing to Act Competently.
(A) A lawyer shall not:
... (3) Neglect a legal matter entrusted to him."
"Rule 1.1. Competence
(a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.
(b) A lawyer is required to comply with the minimum requirements of continuing legal education as prescribed by Louisiana Supreme Court rule."
"Rule 1.3. Diligence.
A lawyer shall act with reasonable diligence and promptness in representing a client."
"Rule 1.4. Communication
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) The lawyer shall give the client sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so.
"Rule 1.15. Safekeeping property
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in a bank or similar institution in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

*515 (c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."
"Rule 8.4. Misconduct
It is professional misconduct for a lawyer to:
(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) Commit a criminal act especially one that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) Engage in conduct that is prejudicial to the administration of justice;
(e) State or imply an ability to influence improperly a judge, judicial officer, governmental agency or official;
(f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law; or
(g) Except upon the expressed assertion of a constitutional privilege, to fail to cooperate with the Committee on Professional Responsibility in its investigation of alleged misconduct.
(h) Present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."
NOTES
[1] The applicable rules are set forth in an appendix to this opinion.
[2] The applicable rules are set forth in an appendix to this opinion.
[3] Respondent contends that his hourly rates were raised to $100 per hour in 1982; however, he admits that his clients were never informed of this increase in his rates.
[4] The clients retain a half-interest in Parcels two and three, valued at $20,250.00.
[5] The applicable rules are set forth in an appendix to this opinion.